NATIONAL HELIUM CORPORATION, Plaintiff-Appellant,

v.

FEDERAL ENERGY ADMINISTRATION and John F. O'Leary, Administrator, Federal Energy Administration, Defendants-Appellees.

No. 10–11.

Temporary Emergency Court of Appeals.

Argued Sept. 23, 1977.

Decided Dec. 22, 1977.

As Amended Feb. 17, 1978.

Emmett A. Blaes, Jochems, Sargent & Blaes, Wichita, Kan., and Russell L. Sohn, Kansas City, Mo., with whom Patrick F. Timmons, Jr., Houston, Tex., and G. Edward Ellison, Vinson & Elkins, Houston, Tex., of counsel, were on brief, for plaintiff-appellant.

Bruce G. Forrest, Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Stanley D. Rose,* Washington, D. C., were on brief, for defendants-appellees.

Before CHRISTENSEN, JAMESON and GRANT, Judges.

JAMESON, Judge:

This appeal presents the question of whether the Emergency Petroleum Allocation Act of 1973 (EPAA)[1] authorizes the Federal Energy Administration (FEA) to provide for the allocation and price control of natural gasoline.[2] Following a careful

---

* Mr. Stanley D. Rose died after the submission of the case but before this opinion was filed.

1. Pub.L.No.93-159 (1973) (15 U.S.C. § 751, et seq.).

2. Section 4(a) of the EPAA required the President to promulgate regulations within 15 days after enactment for the mandatory allocation of "crude oil, residual fuel oil and each refined petroleum product" in amounts and at prices specified in such regulations. The terms "crude oil" and "residual fuel oil" are not defined. The term "refined petroleum product" is defined in subsection 3(5) to mean "gasoline, kerosene, distillates (including Number 2 fuel oil), LPG, refined lubricating oils and diesel fuel". The term "LPG" is further defined in subsection 3(6) to mean "propane and butane, but not ethane". The term "gasoline" is not defined. The regulations promulgated pursuant to Section 4(a) were to achieve, to the maximum extent practicable, the nine general objectives set forth in Section 4(b)(1).

analysis of the nature of the products involved and applicable statutes and regulations, the district court granted FEA's motion for summary judgment, holding that it "would be unreasonable to find that Congress intended to exclude natural gasoline from regulation, in the absence of some explicit evidence to the contrary," and that as a practical matter it was "only reasonable to conclude that it was necessary, and Congress intended, for the federal agency to exercise its authority to regulate natural gas liquids, including natural gasoline, in order to achieve the statutory objectives of the Allocation Act". We affirm.

Appellant, National Helium Corporation (National), contends that (1) the existence of disputed issues of material fact precludes deciding the case on cross motions for summary judgment, (2) natural gasoline was not within the purview of the EPAA, and (3) the FEA's attempt to regulate the prices of natural gasoline was invalid because the FEA failed to issue lawful notice that natural gasoline was subject to the FEA's regulatory scheme. The first two contentions were resolved against National's position in the recent case of *Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Em.App.1977).

## SUMMARY JUDGMENT

■ Mobil contended, as does National, that issues of fact concerning the meaning of terms used in describing the covered products precluded summary judgment. This court concluded, however, that the issue to be decided was solely a legal question of legislative construction, and that the legal question was not what the terms meant in the petroleum industry, but what Congress intended when it used these terms.

The same is true here. Any disputed facts were not determinative of the court's decision, which was based on findings of legislative intent. Summary judgment was proper.

## SCOPE OF EPAA

■ With respect to the scope of the EPAA, this court in *Mobil* affirmed the holding of the district court that the FEA has authority "to regulate the allocation and pricing of all liquid petroleum products recovered from the 'wet' natural gas streams, including condensate, natural gas liquids and natural gas liquid products recovered at gas processing plants (propane, butane, and natural gasoline) except ethane, which is expressly exempted from regulation by Section 3(6) of the Act". In *Mobil* we described the various products involved, including natural gasoline,[3] and set forth in detail the legislative history of the EPAA, statutes and regulations in effect when the act was adopted, and subsequent legislative actions. We examined the FEA's assertion of jurisdiction over all the liquid hydrocarbons derived from natural gas streams in the light of the broad, comprehensive objectives of the EPAA and the agency's mandate to achieve those objectives to the "maximum extent practicable". 15 U.S.C. § 753(b)(1). We found nothing in the EPAA which would prevent the FEA from asserting "regulatory jurisdiction over all natural gas liquids", but rather that "there are strong indications from Congressional actions both before and after the passage of the EPAA that Congress contemplated that these substances would fall within the ambit of agency authority". 566 F.2d at 103.[4]

---

**3.** Natural gasoline is a hydrocarbon mixture derived from "wet" natural gas and may be derived only from natural gas and not from crude oil. It is composed of nearly the same hydrocarbon components as motor gasoline, but in different proportions. It contains more of the lighter, more volatile hydrocarbons. It cannot be used by itself as a motor fuel, but is used as a blending agent in producing motor gasoline.

**4.** We found in *Mobil* that because natural gas liquids play a crucial, integral role in the production of many products explicitly covered by the EPAA, it would have been difficult for the FEA to meet its obligations under the Act if it could not regulate the price and control the supply of those essential materials. We concluded that:

. . . Mobil's construction of FEA jurisdiction under the Act ignores the broad powers and administrative flexibility implied by the comprehensive purposes of the Act.

We recognized in *Mobil* that Congress intended to give the FEA " 'full flexibility in devising the most effective and efficient means of meeting the priority needs of the American people identified in [the Act]' ". *Id.* at 97 (quoting H.R.Conf.Rep.No. 93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News pp. 2688, 2689). Moreover, committee reports evidenced Congress' intent that the EPAA was a mandatory authority to replace and supersede the limited, discretionary authority of the Stabilization Act. See S.Rep.No.93–159, 93d Cong., 1st Sess. (May 15, 1973) 4–6. See also H.R.Conf.Rep.No. 93–628, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong. & Admin.News pp. 2688, 2697.

While *Mobil* was not concerned primarily with natural gasoline, the opinion did articulate specific reasons for concluding that natural gasoline is subject to regulation. It was noted that:

(1) Natural gasoline is primarily used as feedstock for refineries and for petrochemical production. Approximately 6 to 7% of all refinery feedstock consists of natural gas liquids, with natural gasoline more than half the total. Feedstock supplies for both refinery and petrochemical industries were a particular concern of Congress. 566 F.2d 96.

(2) Many small refineries depend upon supplies of condensate and natural gasoline as their raw material for production of motor gasoline. Without power to regulate the supply of natural gasoline, it would be more difficult for the FEA to carry out the intent of Congress that the

small and often independent refiners continue to "operate at full capacity"[5] and to attain the statutory objective of an "economically sound and competitive petroleum industry". 15 U.S.C. § 753(b)(1)(D). *Id.* at 96.

(3) Although natural gasoline cannot be used alone as a fuel for internal combustion engines, it is a "crucial ingredient as a blending agent in the production of motor gasoline . . . Without authority to allocate the supply and control the price of natural gasoline, FEA would not be able to fully regulate motor gasoline to achieve its statutory goals." *Id.* at 97.

We are not persuaded that natural gasoline should be exempt from the provisions of the Act because of its special character, as National argues.[6] As the district court noted, the term "gasoline" was not limited in the Act and "natural gasoline" was not specifically exempted, as was ethane. The district court noted further that since both lighter hydrocarbons (propane, butane and LPG) and heavier hydrocarbon compounds (gasoline and crude oil) are subject to regulation, it "would be unreasonable to find that Congress intended to exclude natural gasoline . . .."

Natural gasoline, like the other natural gas liquids, plays a crucial role in the production of other substances expressly mentioned in the EPAA. We adhere to our conclusion in *Mobil* that the FEA may properly regulate natural gasoline to achieve the clear and comprehensive objectives of the EPAA.[7]

FEA's determination to regulate natural gas liquid hydrocarbons—which comprise many of the same hydrocarbon molecules found in crude oil and the products of crude oil refining and which are often feedstocks for the production of refined petroleum products such as gasoline—was a legitimate selection by the agency of the means necessary for the achievement of its statutory mandate. 566 F.2d at 97.

**5.** Congress was particularly concerned about small and independent refiners because they were believed to stimulate the major refiners to improve efficiency. H.R.Rep.No.93–531, 93d Cong., 1st Sess. (1973); [1973] U.S.Code Cong.

& Admin.News pp. 2582, 2595. Competition was a "fundamental goal". *Id.* at 2596.

**6.** National argues that "gasoline" is a well recognized synonym for motor fuel and that "natural gasoline" is lacking in those substances and compounds that enable its use as a motor fuel. FEA argues that the term "gasoline" was used in its "broad generic category of gasoline, finished and unfinished, derived from both 'wet' natural gas and crude oil".

**7.** Moreover, as we noted in *Mobil,* since the enactment of the EPAA in 1973, FEA and its predecessor, the Federal Office, have consistently maintained jurisdiction over natural gas

## ADEQUACY OF NOTICE

National contends that, "Whatever the scope of FEA's authority, there is no doubt that FEA failed to give adequate notice under the Subpart E[8] rules of either its intent to regulate natural gasoline, or the manner thereof between May 1 and December 31, 1974". National submits that FEA's amendments to Part 212, Subpart E, of its regulatory framework, published on April 5, 1974, were not promulgated in accordance with the Administrative Procedure Act (APA). 5 U.S.C. § 551 *et seq.* The APA requires an agency to give notice of a proposed rule and provide an opportunity for public comment before the rule may be effective, unless there is good cause found and that good cause is explained and published with the rule. 5 U.S.C. § 553.[9] National argues that the FEA failed to meet those standards and that the "good cause" stated for the failure was inadequate.

National contends also that no notice may be inferred from the substance of the regulations and that the FEA rules were a "mass of confusion and contradiction on the subject of natural gasoline". The regulatory framework in Subpart E was geared solely for crude oil refiners and its application to gas plants was strained at best. According to National, few gas plant operators understood the implications of Subpart E and attempted to comply and even the FEA recognized these deficiencies and finally adopted special price rules for gas plant operations. National argues that until the new rules were properly promulgat-

ed, effective January 1, 1975, there were no valid regulations with respect to the pricing of natural gasoline after the Stabilization Act expired on April 30, 1974.

A consideration of these contentions requires a careful analysis of the regulatory history during the period in question. It is undisputed that the Phase IV price regulations under the Economic Stabilization Act of 1970, issued by the Cost of Living Council (COLC) on August 22, 1973, specifically covered natural gasoline. 6 C.F.R. 150.352. The EPAA was enacted on November 27, 1973. Pursuant to the mandate of the EPAA, 15 U.S.C. § 753(a), the Federal Energy Office (FEO), predecessor of the FEA, published notice on December 13, 1973 of proposed revision of Title 10 of the Code of Federal Regulations (C.F.R.). On January 15, 1974, the FEO published these revisions. The price and allocation regulations are contained in parts 210, 211 and 212. Part 210 contains general regulations, Part 211 allocation regulations, and Part 212 price regulations. Section 210.21 defined "covered products" as "all products described in the 1972 Standard Industrial Classification Manual Industry Code 1311 (except natural gas) [crude petroleum] 1321 [natural gas liquids] or 2911 [petroleum refining]". 10 C.F.R. § 210.21. The price regulations contained in Part 212 were merely a republication of the price regulations published earlier by the COLC. See 39 Fed.Reg. 1921 (1974). In other words, FEO adopted and recodified the price regulations then in effect under the Stabilization Act.

---

liquids, including natural gasoline; and Congress in subsequent legislation has failed to revise or repeal the agency's interpretation of the Act.

**8.** "Subpart E" refers to Subpart E of Part 212 of Title 10, C.F.R. ("Refiners").

**9.** 5 U.S.C. § 553 states in pertinent part:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(C) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

Natural gas liquids were regulated as to price under Part 212, Subpart E ("Refiners"), pursuant to the definition of "Refiner" found in section 212.31. That definition reads in pertinent part:

"Refiner" means a firm (other than a reseller or retailer) or that part of such a firm which refines covered products or blends and substantially changes covered products, or *refines liquid hydrocarbons from oil and gas field gases* . . .. (Emphasis added).

On March 29, 1974, the FEO published notice of proposed amendments to the allocation regulations in Part 211. 39 Fed.Reg. 11768 (March 29, 1974). These amendments were "largely technical in nature and not intended to reflect fundamental policy changes", but rather were to "clarify and make more precise" FEA's regulatory scheme. *Id.* Under the proposed amendments, certain products which, prior to January 15, 1974 had been regulated under the Stabilization Act, but which were considered by the FEO to be outside the scope of the EPAA, see 39 Fed.Reg. 1933 (1974), would be excluded from coverage, namely "petroleum wax, petroleum coke, asphalt, road oil, and refinery gases. . . ." *Id.* at 11771. The FEO also proposed to define "motor gasoline" as inclusive of natural gas liquids when used as a blending stock to form motor gasoline. *Id.* at 11780 (§ 211.-51).

With respect to price regulations, on April 5, 1974, the FEO published the amendments, effective immediately, in anticipation of the expiration of the Stabilization Act.[10] 39 Fed.Reg. 12353 (1974). The term "covered products" no longer referred to the industrial code classifications, but instead restated the statutory terms "crude oil, residual fuel oil, and refined petroleum products". *Id.* at 12354. The agency rationalized the absence of prior notice and an opportunity for public comment by stating it had found good cause for ignoring the

APA requirements: "to provide immediate guidance and information with respect to the mandatory price regulations and to permit the amendments to be implemented during the month of April, the Federal Energy Office finds that normal rulemaking procedure is impracticable . . .." *Id.* Notably the FEO made no substantive changes in the price regulation framework it had adopted on January 15 and, in particular, made no change in the definition of the term "refiner".

On May 6, 1974, pursuant to the notice given on March 29, the FEO published revised allocation regulations. 39 Fed.Reg. 15960 (1974). The new definition of "motor gasoline" did not include its blending stock as originally proposed. The revision of the Part 211 allocation regulations, however, was not completed at that time. Subsequently, on May 21, the FEO published notice of proposed revision of Subparts C (Crude Oil), E (Butane), J (Petrochemicals), and K (Other Products). 39 Fed.Reg. 17916 (1974). The FEO proposed to regulate natural gasoline expressly under Subpart E. The FEO recognized "that its authority to allocate natural gasoline has been questioned", but chose to assert jurisdiction because it believed it did have authority. *Id.* The FEO invited comments on the issue. After considering the comments received, the newly created FEA reconfirmed its authority and on July 9, 1974, published new Subpart E allocation regulations to that effect. 39 Fed.Reg. 25224 (1974).

On September 10, 1974, the FEA gave notice of revisions of the price regulations under Part 212. The FEA noted that although natural gas liquids had been subject to price regulation continuously since the Cost of Living Council's Phase IV price controls promulgated in August, 1973, its experience with the existing regulatory framework, which had carried over substantially intact from the Cost of Living Coun-

---

**10.** The April 5 amendments to the price regulations paralleled the March 29 notice of proposed amendments to the allocation regulations and were intended to serve a similar technical purpose. Like the March 29 proposals, the April 5 amendments made it clear that "asphalt, road oil, refinery gas, petroleum wax and petroleum coke" would thereafter be exempt from regulation. 39 Fed.Reg. 12354 (1974).

cil, led to the conclusion that a special set of price rules was necessary to cover natural gas processors. 39 Fed.Reg. 32718–19 (1974). From the beginning, the Government had placed gas processors within the broad category of "refiners". The rules, procedures and forms developed primarily for crude oil refiners were made applicable to gas processors. The FEA recognized that the price regulation framework for oil refiners was not "well suited" to gas processors because the two operations were distinct. The result was inequitable treatment of gas plant operators, effectively limiting the lawful price of natural gas liquids to their May 15, 1973 levels.[11] Low prices led to lessened incentives for production, while simultaneously increasing the demand. The FEA therefore proposed the addition of a new Subpart K to apply to natural gas liquids, with the objective of maintaining prices "as low as is reasonably possible without adversely affecting the availability of the product". 39 Fed.Reg. 32719 (1974).

After taking comments on these proposals and conducting public hearings, the FEA, on December 24, 1974, published its new Subpart K program for price regulation of natural gas processors. 39 Fed.Reg. 44407 (1974). The FEA acknowledged that there was no single "ideal solution" because of the rather complicated contractual arrangements typically involved in the marketing of natural gas liquids. *Id.* at 44408.

The new rules became effective January 1, 1975. Again, we note that the definition of "Refiner" for the purposes of Part 212 remained unchanged throughout these revisions.

On May 29, 1975, the FEA took another look at the problems of gas processors during the period when the ill-suited "refiner" rules applied to their operations. 40 Fed. Reg. 23272 (1975). The FEA noted that the new rules under Subpart K were prospective, but concluded that "the basic issues which the Subpart was intended to resolve have been in existence since the inception of FEA regulations and that insofar as practicable, they need to be resolved with respect to the period prior to January 1, 1975. . . ." *Id.* at 23273. The FEA accordingly issued its ruling to clarify that increased costs of natural gas shrinkage could be passed through as increased product costs for the period before January 1, 1975, when the Subpart E refiner rules still controlled.[12]

From the foregoing it is clear that in the promulgation of price or allocation regulations, the FEA satisfied the requirements of Section 553 of the APA with respect to notice and opportunity to comment, except for the amendments to Part 212 promulgated on April 5, 1974. Accordingly National's contention that no valid price regulation of

---

11. The FEA explained this as follows:

In effect, the application of the refiner price rules to gas plants has had the result of limiting the lawful prices of natural gas liquids to essentially their May 15, 1973 levels, since gas plants have typically had little or no increased cost of natural gas, from which natural gas liquids are produced. The natural gas from which these liquids are extracted is not consumed in the process, as is crude oil in the refining process. Rather, there is a "shrinkage" in the volume and BTU content of the gas. The regulation of most natural gas prices by the Federal Power Commission has meant that the price of the gas which is lost in the processing of natural gas liquids (i. e., the "shrinkage" cost) has not increased in any significant sense. This is, of course, in marked contrast to the dramatically increased cost of crude oil which most refiners have experienced. Further, the operating costs of gas plants have not increased in

amounts sufficient to justify any significant price increases to reflect increased nonproduct costs, which could be obtained under the prenotification procedures of Subpart I of Part 212.

*Id.* at 32719.

12. The FEA subsequently took a further step to remedy past failings by granting a class exception to all firms other than resellers and retailers, who sold natural gas liquids from August 19, 1973, through December 31, 1974, to the extent that these products were produced in gas processing plants. The exception permitted the regulations in Subpart K to be applied retroactively. Firms were permitted to use the adjusted May 15, 1973 selling price specified in Subpart K, to recover nonproduct cost increases actually experienced up to $.0025 per gallon, and to disregard certain regulatory provisions otherwise applicable to the members of the class. 40 Fed.Reg. 40824 (1975).

natural gasoline existed for the period between May 1, 1974 and January 1, 1975 depends upon the propriety and effect of these particular amendments.

■ We recognize that in previous cases involving challenges to the procedural propriety of agency regulations, this court has been critical of agency actions, especially when those actions evidence a "cavalier disregard of procedural requirements". *Tasty Baking Co. v. Cost of Living Council*, 529 F.2d 1005, 1014 (Em.App.1975). And in *Shell Oil Co. v. FEA*, 527 F.2d 1243 (Em.App.1975), we considered and rejected the FEA's good cause justification for issuing certain Part 212 price regulations without notice.[13] An agency's "repeated technical non-compliance" with the requirements of 5 U.S.C. § 553 should not be tolerated. *Nader v. Sawhill*, 514 F.2d 1064, 1069 (Em.App. 1975).

Nevertheless, we have also declined to follow a "doctrine of technical absolutism . . . ." *California v. Simon*, 504 F.2d 430, 439 (Em.App.1974), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). In that case we examined the alleged procedural errors in the light of the circumstances surrounding the FEO's issuance of the disputed regulations. We found that the FEO was "entitled to reasonable leeway in the gale of the congressional deadline while it assumed charge of the regulatory structure . . . ." *Id.* at 437. We also considered the impact of the regulation at issue upon the party seeking invalidation and found no detrimental effect. *Id.* We concluded that in the context of an "embryonic agency faced with complicated takeover tasks," which had substantially, though not technically complied with required procedures, there was no unfair-

ness or unreasonableness which warranted overturning the agency action. *Id.* at 439.

National has pointed to the inadequacies in FEA's "refiner" price rules to argue that the regulatory framework did not impart any notice to gas processors that they were expected to comply. The FEA has been criticized justifiably for its failure to provide more specific regulations for gas processors at an earlier point in time. As a result many gas processors did not comply with the existing "refiner" rules, and the FEA made little effort to seek enforcement. The FEA itself has acknowledged that it inordinately delayed in promulgating the special Subpart K rules for gas processors. See Report of the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary of the U.S. Senate, 94th Cong., 1st Sess. 35–36 (1975).

■ We do not believe, however, that these admitted agency shortcomings justify permitting National to operate unrestricted for the period from May 1, 1974 to January 1, 1975. Throughout much of this period the FEA—and the FEO before the FEA replaced it on June 27, 1974 [14]—struggled with the difficult problems of regulating the natural gas liquids segment of the petroleum industry. With regard to price rules, the complicated and diverse contractual relations between producers and processors in the marketing of natural gas liquids precluded any easy or "ideal" solution. Similarly, with regard to allocation rules, the FEO and FEA were actively trying to formulate workable regulatory programs.[15] That the administrative regulations were initially not "well suited" to achieve a particular goal does not necessarily mean that parties subject to those rules may avoid their application by claiming they were not

---

13. In *Shell*, the court held that the FEA may not, pursuant to its authority under the EPAA, regulate the rent charged for real property used in retailing gasoline. This was clearly a substantive change which required notice and the court found no circumstances justifying a failure to comply with the APA. See 527 F.2d at 1248.

14. The FEA was created pursuant to The Federal Energy Administration Act of 1974, Pub.

L.No. 93–275, 88 Stat. 96 (May 7, 1974). Although much of FEA's functions derived from the FEO, the FEA was in some respects an "embryonic agency" at that time.

15. For example, the FEO initially proposed to allocate natural gasoline under the subpart pertaining to "motor gasoline." After consideration of public comment, it decided to opt for allocation regulation of natural gasoline under the butane subpart.

on notice, especially where, as here, the agency continuously asserted that the parties were subject to the agency's authority.

More important, however, to a determination of the validity and adequacy of the notice to National is the impact of the April 5, 1974 amendments. In effect the amendments merely excluded certain materials from coverage under the Part 212 price regulations. The amendments did not alter the existing regulatory framework; the refiner rules in Subpart E were unchanged and the term "refiner" still comprehended a firm which "refines liquid hydrocarbons from oil and gas field gases . . . ." 10 C.F.R. § 212.31. National admits to FEO jurisdiction under the regulatory framework extant prior to the April 5, 1974 amendments and the expiration of the Stabilization Act on April 30, 1974. Yet, nothing in those amendments should have led National to believe that gas processing was thereafter no longer subject to agency authority.[16] The amendments were largely technical in nature to conform the language in the regulations to the language of the EPAA. We agree with the FEA that the substitution of the term "refined petroleum products" in the definition of "covered products" had no substantive effect. National fits the definition of refiner contained in the regulations both before and after April 5, 1974, and as such was subject to "refiner" price rules. Since the price framework was developed in August, 1973, the FEA has consistently used the term "refiners" to refer broadly to natural gas processors.[17]

We find no substantial detriment or unfairness to National resulting from the agency's failure to give notice of the April 5, 1974, amendments prior to their publication. It is true that for the period prior to the January 1, 1975 effective date of the special Subpart K rules, gas processors were subject to ill-suited price controls which effectively limited prices to their May, 1973 levels. Nonetheless, subsequent agency actions permitting gas processors pass-throughs of certain production costs and making Subpart K retroactive meant that gas processors were no longer required to comply with the inappropriate refiner rules for the period prior to the promulgation of Subpart K.

National argues further that statutes and regulations that contain criminal penalties and operate retroactively carry "an additional burden of notice". As the district court noted, possible liability for criminal penalties is not an issue in this action for declaratory relief in that there are "no criminal proceedings before this court, nor is there any contention that such proceedings are pending elsewhere, or even contemplated". Nor is National in a position to complain of the retroactive regulation, since its application was to National's benefit rather than detriment.[18]

In addition to the "good cause" exception to the notice and comment requirements of 5 U.S.C. § 553, there is an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice". § 553(b)(3)(A). In construing this exception, rather than rely on a "facile semantic distinction" between interpretative rules and substantive or legislative rules, courts

---

**16.** As the district court concluded, "it cannot be argued that National was unaware of the FEA's intention to regulate natural gasoline. FEA's intention to do so, is stated numerous times in the various notices of proposed regulation published between December, 1972 and May, 1975, both explicitly and in terms of adaptation of the ESA regulations. National could hardly have been surprised by the regulations published during that period."

**17.** National acknowledges the existence of allocation regulations which covered natural gasoline, but contends it cannot be deemed to have

had notice of coverage, under price regulations because the two regulatory programs were distinct. Price regulations and allocation regulations, however, derive from the same authority. If National knew of allocation regulations it should have expected the application of price regulations as well.

**18.** Moreover, a retroactive rule of administrative agency is invalid, generally speaking, only if unreasonable. *California v. Simon, supra*, 504 F.2d at 438–439. We find nothing unreasonable in the retroactive application of Subpart E rules in this case.

have looked instead to the "basic purpose of [the] statutory requirements [of notice and comment]" in deciding whether the requirements should be imposed. *Pharmaceutical Manufacturer's Association v. Finch*, 307 F.Supp. 858, 863 (D.Del.1970). When an agency action has "palpable effects" upon the regulated industry and the public in general, it is necessary to expose that action "to the test of prior examination and comment by the affected parties". *National Motor Freight Traffic Association v. United States*, 268 F.Supp. 90, 96 (D.D.C.1976) (three judge court) *aff'd per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

The APA's rulemaking procedures "were designed to assure fairness and mature consideration of rules of general application". *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969). The prior publication and opportunity for comment requirements enable "the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated". *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3 Cir. 1969). When the questioned agency action does not jeopardize substantive rights or have a "substantial impact" on the purportedly regulated parties, or "create substantive effects upon the rights of the parties not involved in the proceedings," then lack of compliance with the prior notice and comment requirements of the APA is not fatal. *Pennsylvania v. United States*, 361 F.Supp. 208, 220–22 (N.D.Pa.) (three judge court), *aff'd* 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973).

The FEA has not expressly argued that the "interpretative rule" exception [19]

should apply to the April 5 amendments, but rather contends that there was "no occasion for rulemaking" in that the amendments "had no substantive effect". In any event, we conclude that under the exceptions to § 553, the lack of notice and opportunity to comment on the April 5 amendments did not invalidate the price control program for natural gas procession for the period from May 1, 1974 to January 1, 1975. The stated "good cause" was that normal rulemaking was "impracticable" because of the need to implement the amendments prior to the expiration of the Stabilization Act so that the FEA's regulatory program would conform to the authority granted by the EPAA. Because the change was largely technical and did not substantively alter the existing regulatory framework or in any way affect the application of the "refiner" rules to gas processors, and because there was ultimately no detrimental impact on the rights of the parties regulated, prior notice and opportunity to comment were "unnecessary".[20] 5 U.S.C. § 553(b)(3)(B). We conclude that neither substantive nor procedural inadequacies in the refiner price rules, as applied to gas processors, warrant allowing gas processors to operate unrestricted for the period at issue.

The judgment of the district court is affirmed.

---

**19.** In general "[t]he question whether a rule is legislative or interpretive . . . depends upon whether or not it is issued pursuant to a grant of law-making power". K. Davis, Administrative Law, § 5.03 (1958). However, courts have not always relied on that distinction when addressing the question of whether notice and opportunity to comment are required under the interpretative rule exception to 5 U.S.C. § 553. Arguably the rules here were merely interpretative of the grant of jurisdiction; the FEA's regulatory framework, on the other hand, would be legislative. *Cf. Jo-*

*seph v. United States Civil Service Commission*, 554 F.2d 1140, 1153–54 nn. 23–26 (D.C. Cir. 1977).

**20.** Regulations may stand if the court can take judicial notice of factors supporting "good cause". See, *e. g., Tasty Baking Co. v. Cost of Living Council*, 529 F.2d 1005, 1014 (Em.App. 1975); *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Em.App.1975); *California v. Simon*, 504 F.2d 430, 439 (Em.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974).