**DORCHESTER GAS PRODUCING COMPANY, Dorchester Gas Processing Company, Exxon Corporation, Texaco Inc., Mobil Oil Corporation, and Mobil Oil Exploration & Producing Southeast, Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY and Donald Hodel, Secretary of Energy, Defendants.**

**Civ. A. No. CA–3–75–0836–W.**

United States District Court,
N.D. Texas,
Dallas Division.

Nov. 23, 1983.

Supplemental Memorandum Dec. 21, 1983.

W.B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, Tex., for Dorchester.

M.W. Parse, Jr., Jerry E. Smith, A. Frank Koury, Fulbright & Jaworski, Houston, Tex., M.W. Parse, Jr., Fulbright & Jaworski, Washington, D.C., Louis J. Weber, Jr., Jenkins & Gilchrist, Dallas, Tex., Barbara Finney, Houston, Tex., for Exxon.

Neil J. King, Wilmer, Cutler & Pickering, Washington, D.C., for Phillips.

David R. Noteware, Thompson & Knight, Dallas, Tex., Michael J. Henke, C. Michael Buxton, Thomas A. Stout, Jr., William D. Holyoak, Vinson & Elkins, Washington,

D.C., Stephen H. Bard, Texaco Inc., White Plains, N.Y., for Texaco.

Michael Lowenberg, Akin, Gump, Hauer & Feld, Dallas, Tex., Charles S. Lindberg, Donald E. Marquardt, New York City, E.S. McCrum, Mobil Oil Exploration & Producing, New Orleans, La., Michael Lowenberg, R. Bruce McLean, Danield Joseph, Harry R. Silver, Leslie K. Dellon, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Mobil.

Robert F. VanVoorhees, Kirkland & Ellis, Washington, D.C., Lawrence G. Newman, Newman, Shook & Newman, Dallas, Tex., for Standard Oil.

Barbara A. Babcock, C. Max Vassanelli, Mellie H. Nelson, Civ. Div., U.S. Dept. of Justice, Don W. Crockett, Mark Kreitman, Thomas A. Schweitzer, John L. Gurney, Dept. of Energy, R. John Seibert, Federal Programs Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., James A. Rolfe, U.S. Atty., Charles Cabaniss, Asst. U.S. Atty., Dallas, Tex., Clinton E. Averitte, Roger L. McRoberts, Asst. U.S. Attys., Lubbock, Tex., for defendants.

## MEMORANDUM ORDER

WOODWARD, Chief Judge.

Judgment has not been entered in this case but a memorandum opinion was filed on June 24, 1983. Various motions have since been filed by the plaintiffs. The court's opinion of June 24th is referred to and adopted as a part of this memorandum order except to the extent that it may be modified or changed herein. All outstanding motions will be disposed of by this memorandum order.

Briefly, the plaintiffs in this case seek a declaratory judgment which would in effect nullify certain regulations and interpretations of the defendant and its predecessor agencies and the defendants pray for a declaratory judgment upholding these same regulations and interpretations.

## BACKGROUND

Under the authority of the Emergency Petroleum Allocation Act (EPAA) 15 U.S.C. §§ 751 *et seq.*, the FEA promulgated Subpart E which controlled the price refiners could charge for certain petroleum products, including NGLs. Natural gas processors were held to be "refiners" and thus subject to Subpart E. *National Helium Corp. v. FEA*, 569 F.2d 1137, 1145 (TECA 1977). The Subpart E regulations, however, were better suited for crude oil refiners, and in 1974 the FEA proposed Subpart K regulations specifically applicable to natural gas processors. Subpart K became effective January 1, 1975.

Both parties (by cross motions for summary judgment) seek to have their methods for calculating the increased costs of natural gas from which NGLs are extracted declared reasonable and the methods of the opposing party declared unreasonable.

In its previous memorandum, the court essentially held that the regulations and interpretations of the Department of Energy (DOE) were proper and, with the exception of the ethane exclusion, the court denied plaintiffs' motion for summary judgment and granted the cross motion for summary judgment filed by the defendant. The various motions subsequently filed by plaintiffs generally assert the following:

(1) Though the court held the transfer-pricing method unreasonable under Subpart E, given the ambiguity of the regulation, plaintiffs' alternative "incremental" method should be held reasonable.

(2) Under the recent Supreme Court decision the promulgation of Subpart K was arbitrary and capricious since DOE failed to consider fixed-quantity contracts.

(3) The court misread or overlooked various agency interpretations.

(4) The inclusion of the fixed-quantity contract price in the weighted average cost of shrinkage is an unreasonable interpretation of Subpart K in that there was no revenue loss attributable to the fixed-quantity contracts.

(5) The underlying Acts, the EPAA and EPCA, are invalid (under the *Chadha* decision) because they both contain one-house veto provisions.

Because this case covers two distinct regulatory periods, it is necessary to briefly outline the methods actually used by the plaintiffs during the relevant periods. Subpart E was in effect from late 1973 through 1974 and Subpart K became effective January 1, 1975.

## TEXACO

During Subpart E period and until 1976, Texaco used a transfer pricing method of calculating increased costs. During 1976 and early 1977, Texaco used the weighted average method of calculating cost of shrinkage now advocated by DOE. During this latest period, Texaco computed the weighted average by using the sales price for *all contracts* from the sale of gas from its processing plant, including fixed-quantity contracts and contracts for the sale of surplus gas.[1] In May 1977, Texaco began using its so-called "incremental method"; that is, Texaco calculated shrinkage costs based on surplus contract prices, excluding from the calculation the price received under the fixed-quantity contracts. Affidavit of B.B. Fox in Support of Texaco Inc.'s Motion for New Trial, page 2. In December 1978, Texaco refiled to claim increased costs for the period prior to May 1977 to reflect costs computed pursuant to the incremental method.[2] Counsel for Texaco at the October 25, 1983 hearing stated that the re-filings were "accepted by DOE."

## EXXON

Plaintiff Exxon passed through no increased costs for NGLs during August, September, and October 1973. During the period November 1973 through March 1974, Exxon computed increased costs under a formula permitted for old crude oil. *See* Exxon's Supplemental Answers to Defendant's First Set of Consolidated Interrogatories and Request for Production of Documents filed April 1, 1982. In April 1974, Exxon again changed methods and until December 1974, utilized a transfer pricing method, based on its historical system of accounting. This formula utilized the Exxon posted prices for propane and motor gasoline. Exxon re-filed, seeking to make this transfer pricing method effective as of November 1973. *Id.* During Subpart K, Exxon employed its incremental method of calculating shrinkage.

## MOBIL

Plaintiff Mobil initially challenged the regulatory control of NGLs under Subpart E, lost this suit, and then refiled and used what is in effect the incremental method. *Mobil Oil Corp. v. F.E.A.*, 566 F.2d 87 (TECA 1977). The court in *Mobil* affirmed the holding of the district court that the FEA has authority "to regulate the allocation and pricing of all liquid petroleum products recovered from the 'wet' natural gas streams, including condensate, natural gas liquids and natural gas liquid products recovered at gas processing plants (propane, butane, and natural gasoline except ethane)." 566 F.2d 87 (TECA 1977). Mobil, during both the Subparts E and K periods, sold processed gas under five fixed volume contracts and sold the remainder under a sixth contract to Channel Industries. The parties disagree over the characterization of the Channel Industries contract as a "surplus" contract. The Channel contract did in fact contain a maximum

---

1. Argument of counsel for Texaco at the October 25, 1983 hearing in Abilene, Texas.

2. Counsel for Texaco and the letter from Texaco's Comptroller to Mr. Richard Anderfuren

state that Texaco refiled in December 1978. The Affidavit of B.B. Fox, however, states that Texaco refiled in October 1979.

volume limit term, but that limit was exceeded only once. In calculating its increased costs, Mobil used only the prices received from the Channel Industries contract and ignored the fixed-quantity contracts.

## RE–FILING PROVISION

Texaco and Exxon claim the above to be the methods they "actually used" by virtue of resubmitting monthly reports.

Section 212.126(b) of the DOE Mandatory Petroleum Price Regulations (10 C.F.R. § 212.126(b), 39 Fed.Reg. 1961, January 15, 1974) requires that refiners

> ... shall prepare and file with the FEO periodic reports in accordance with forms and instructions issued by FEO. Each refiner shall submit its calculations under the formulas of § 212.83 in accordance with the forms and instructions issued by FEO.

Forms FEO–96, FEA/DOE P110 and EJA–14 were issued pursuant to this provision. Both forms P110 and FEO–96 contain the question, "Is this a resubmission?" and a box to check either "yes" or "no." Neither the forms nor the regulations define the purpose or scope of the resubmission procedure.[3] The forms provided no time limit for resubmission.

Effective May 1, 1979, the DOE amended § 212.126 to limit refiling to one year after the original filing except where expressly authorized by DOE or where written permission to resubmit or refile is granted for good cause shown. 44 Fed.Reg. 14534, March 13, 1979, 10 C.F.R. § 212.126(d). DOE stated that the purpose of the allocation reports is to assure compliance with § 212.83 (Subpart E).

> "We recognize that these reports sometimes require the use of estimated data and that in dealing with such calculations some good faith errors are unavoidable. However, in order to more effectively stabilize cost allocation data for the purpose of finalizing compliance actions or

audits, and to prevent possible circumvention of the regulations by inappropriate use of the resubmission procedure, it is necessary to issue explicit regulatory provisions regarding the time for refiling cost allocation reports by refiners and the types of revisions which may be made on the forms." 44 Fed.Reg. 14535 March 13, 1979.

Though such language might appear to preclude the use made by Texaco and Exxon of the refiling procedures, the interpretation of the DOE apparently concedes that a resubmission may be made to reflect the refiner's new methodology. When initially proposed, the amendments contained a sixty-day limit on refiling. Comments received in response convinced DOE to allow a full year to refile. One of the criticisms received was that "any increased allowable costs in a prior period due to retroactive DOE interpretations, rulings and clarification and court decisions could not be automatically reported by a unilateral refiling of an amended cost allocation form." Thus, the agency contemplated the use of the resubmission procedure to retroactively adopt a new method.

Further, the FEA stated that "While such resubmissions and refilings will be automatically accepted, the adjusted data submitted will be subject to verification and approval." *Id.*

## SUBPARTS E AND K

The Mandatory Petroleum Pricing Regulations basically froze the prices of all refined petroleum products at their May 15, 1973 levels. The regulations specified the permissible price increases. Subpart E applied to the sale of refined products by "refiners."

§ 212.81 Applicability

... this subpart applies to each sale of a covered product which is purchased or refined by a refiner.

§ 212.82 Price Rule

---

**3.** Form P110–M–1 Specific Instructions states: "Item (7)—Is this a resubmission? Answer 'Yes' if you are supplying additional information or

are resubmitting a report. In either case, the form must be completed in its entirety."

(a) *Rule.* A refiner may not charge to any class of purchaser a price in excess of the base price of that covered product except to the extent permitted pursuant to the provisions of paragraphs (c) through (k) of this section.

(b) *Price increases.* A price in excess of the base price of an item in a product line may be charged only to recover on a dollar-for-dollar basis *those net increases in allowable costs* that have been incurred with respect to the product line ....

(2) ... "Allowable costs" under this section means *non-product* costs attributable to refining operations....

(emphasis added)

The "base price" is defined in § 212.82(f) as the May 1973 price plus "increased product costs" incurred between the month of measurement and the month of May 1973.[4]

§ 212.83 prescribes the method of computing the base price pursuant to § 212.-82(f). This section, however, pertains to the pricing of petroleum products produced from *crude* oil, as opposed to natural gas.

§ 212.83. Allocation of refiner's increased product costs.

(b) *Definitions.* For purposes of this section—'cost of petroleum product' means (1) for purposes of domestic petroleum products *other than crude petroleum,* the *purchase price* including transportation costs....

"Increased product costs" are defined as the increase in the total cost of crude (between the month of measurement and May 1973) *plus* the increase cost of petroleum product.

Under Subpart E, the costs refiners (or processors) were allowed to pass through were based on their actual cost of raw materials and refining operation costs. Where crude oil was a raw material used in

producing a refined product, the regulations allowed the price to increase considerably. The price of crude was permitted to rise to this extent because the market price of oil was rising so astronomically.[5]

The price of refined products produced from natural gas, on the other hand, was not allowed to rise as dramatically; rather, they were effectively limited to their May 1973 prices. *See National Helium Corp. v. FEA,* 569 F.2d 1137, 1143 (TECA 1977), *citing* Emergency Amendment to Special Propane Rule, 39 Fed.Reg. 28608. The price of a petroleum product therefore depended in part upon the raw material from which it was produced.

The plaintiffs first argue that, analogizing natural gas to crude oil, their transfer-pricing is a reasonable method under Subpart E.

This court has already found the transfer method unreasonable. (Memorandum Opinion, page 17.) As stated before (and as indicated by the regulations cited above), the intra-firm transfer price was allowed *only* for *imported* crude. Further, the Emergency Amendment to the Special Propane Rule explicitly prohibited the calculation of increased costs of NGLs based on acquisition of natural gas from an affiliated entity. § 212.83(c)(1)(iii). The intra-firm transfer price utilized by Exxon referred to the "posted" price of crude. Though Exxon self-servingly argues that such a reference price results in a parity of pricing between products produced from gas and those produced from crude, the fact is that crude prices were rising while natural gas prices were not. Thus Exxon was attributing increased product costs to NGLs which, contrary to the scheme of Subpart E, had no basis in reality.

---

**4.** The May 1973 ceiling price is the weighted average sales price on May 15, 1973; subsection (f) states that "In computing the base price, a firm may not exclude any temporary special sale, deal or allowance in effect on May 15, 1973." In other words, the regulations warned *the refiners not to arbitrarily or unjustifiably* maximize their base price calculation.

**5.** It was in fact the oil embargo that led to the mandatory allocation and price control of petroleum products in the first place. The purpose was to keep the prices stable without stifling production.

Since Subpart E was geared primarily to crude oil refiners, many gas processors were left with 1973 prices. If the processor bought the natural gas he processed, the increased cost based on that *purchase price* could be passed through under Subpart E as an increased product cost. Processors who processed their own natural gas, however, were denied inter-affiliate transfer prices, and could only pass through certain increased costs of production as increased non-product costs. Since they did not purchase raw materials, they incurred no actual increased product costs, but rather were effectively limited to the increased costs of producing the natural gas. Since the cost of producing natural gas did not increase significantly during the E period, their prices were effectively frozen at or near 1973 prices.

The FEA recognized the lack of attention given gas processors in the regulations: "... while natural gas liquids are subject to the FEA's mandatory price regulations, increased costs associated with the production or processing of natural gas liquids have generally been minimal and there has been no precise method for passing any increased costs through in the present regulations. The FEA is aware of the need for improving its regulations in this area and will be proposing amendments for this purpose in the immediate future. In the meantime, the amount of increased product costs which may be passed through by refiners is subject to the general principle that such increased costs are limited to those cost increases which reflect payment of lawful prices." 39 Fed.Reg. 28608, August 9, 1974.

Thus the issue is whether the plaintiffs' "incremental" method was a reasonable one under Subpart E in that it reflected the payment of lawful prices. The FEA permitted the Subpart K shrinkage formula to be applied retroactively to the E period. 40 Fed.Reg. 10824 September 4, 1975. The plaintiffs' incremental method will therefore be discussed in the context of Subpart K, but the reasonability of the method must be judged in terms of the two distinct regulatory premises of Subpart E and Subpart K. This court rejected the plaintiffs' incremental method during the K period in the original Memorandum Opinion. The FEA directly addressed the problem of NGL pricing and the natural gas/crude oil pricing disparity by enacting Subpart K. While Subpart E basically allowed the increased price *paid* by the processor or refiner for the raw material used in processing, Subpart K calculated increased costs based on what the processed gas *would have been sold for* by the processor had it not been lost in the extracting process. Under Subpart K, what the gas *would* have been sold for is measured by the contracts in effect.

Subpart E and Subpart K attack the problem of determining actual increased natural gas (product) costs from two fundamentally different directions. Subpart E sought to base the price of the product on the *cost* of the natural gas to the processor; Subpart K sought to base the price on the price for which the processor would have *sold* that gas (under existing contracts) had it not been used in processing NGLs.

In that the purpose of the pricing regulations was (1) incentive for production of NGLs (2) minimization of prices, Subpart K's opportunity methodology struck the balance more in favor of the incentive to produce. As set out in the original Memorandum Opinion, the relevant provisions of Subpart K are sections 162 and 167. 10 C.F.R. § 212.162 defines "cost of shrinkage" as:

[t]he reduction in selling price per thousand cubic feet (MCF) of natural gas processed, which is attributable to the reduction in volume or BTU value of the natural gas resulting from the extraction of natural gas liquids, as determined pursuant to the *contracts in effect at the time* for which cost of natural gas shrinkage is being measured, and under which the *processed* natural gas is *sold*. (emphasis added)

10 C.F.R. § 212.167(b) defines "Increased product costs" as

(3) the difference between the *weighted average cost* of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the month of May 1973, and the *weighted average cost* of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the current month, multiplied by the number of thousand cubic feet (MCF's) of natural gas processed in the current month. (emphasis added)

■ As DOE contends, and the court agreed as the proper interpretation, Subpart K requires the processor to weight average *all* contracts in effect—both fixed-quantity and surplus—for the sale of residue gas to calculate the loss resulting from shrinkage. The plaintiffs' incremental method would exclude the lower-priced fixed-quantity contracts from that weighted average calculation.

■ With respect to Subpart E, the use of an opportunity cost method which excludes the fixed-quantity price, is unreasonable. Subpart E sought to allow the pass-through of *actual* increased *costs;* the FEA allowed a reasonable method which would, in effect, reflect the payment received by the processor in the sale of the processed gas. The costs at which the processor would have sold the gas used in processing, only reasonably reflects *actual* costs if the fixed-quantity contract price term is included. An essential fact that the plaintiffs refused to concede at the October 25th hearing and glossed-over in their briefs, is that one of the two objectives of the EPAA was the minimization of the price of petroleum products. To use only higher price surplus contract terms in calculating the increase cost of natural gas circumvents price control mandated by Subpart E.

■ With respect to Subpart K, plaintiffs' incremental method is also unreasonable.[6] The Preamble to Subpart K states that "The cost of shrinkage shall be computed based upon the *contractual terms in effect* for the sale of natural gas *during*

the time period for which shrinkage cost is being measured."* 39 Fed.Reg. 44409, December 24, 1974 (emphasis added). Clearly, the exclusion of the fixed-quantity contract price was not contemplated by the regulations, but rather subverts their purpose.

The plaintiffs argue that since there is no loss of revenue resulting from the extraction of NGLs under *satisfied* fixed-quantity contracts, Subpart K contemplates, or at least permits, the exclusion of fixed-quantity contracts. *See e.g.* Exxon's Reply to Defendants' Response, page 4. This argument, however, proves too much. When there are outstanding contracts—fixed-quantity or otherwise—and a stream of gas enters a plant for processing, part of the BTU content that could conceivably have gone toward satisfaction of those existing contracts is lost. In other words, the loss of revenues from processing actually pertains to *all* the existing contracts. Plaintiffs' theoretical attribution of the loss of revenue due to processing exclusively to surplus contracts is spurious; it is merely a rationalization for charging the highest price possible. Plaintiffs obviously would not realize as much shrinkage loss by using their long-term low price contracts as they would on their more current contract; that is· not a phenomenal or unique situation; nor is it a valid excuse to evade the regulations and exclude fixed-quantity contracts from calculating shrinkage.

Further, plaintiffs argue that the shrinkage calculation should include contracts under which the liquids would have been sold but for processing, but exclude contracts under which the liquids would not have been sold. Fixed-quantity contracts should, according to plaintiffs, therefore be excluded because *no more than the committed quantity would have been sold thereunder* by any rational processor. This argument presumes that the regulations intend to allow processors to recoup increased costs based on prices that could presently be contracted for gas. The fact that Exxon would sell "no more than the

---

**6.** Plaintiffs' argument was rejected in the original Memorandum Opinion, pages 5–7.

committed quantity" is totally irrelevant. Exxon is presumed by the regulations to sell only the fixed amount at that contract price; that is why the average of all such contract prices are *weighted*. The price which Exxon actually received under the fixed-quantity contract, though not a price that Exxon would necessarily contract for at the time of measurement, is none the less relevant for calculating loss of revenues due to shrinkage. The dollar-for-dollar pass through entails actual, not potential, prices.

The plaintiffs finally make a construction argument with respect to Subpart K. Plaintiffs argue that since § 162 does not mention "weighted average", that term, when used in § 167 pertains only to those situations where one entity operates several gas plants and calculates a single cost of shrinkage. Ruling 1973–18 directly refutes such a strained reading of the regulations:

> The purpose of requiring a "weighted average" cost comparison is to provide a method by which firms which have chosen, pursuant to § 212.167(b), to aggregate the total amount of increased product costs respecting volumes of natural gas subject to differing sales contracts which are processed in *one* or more plants, may calculate a single amount representing the increased costs of natural gas shrinkage for the aggregate of volumes of natural gas processed. Accordingly, the above formulae provide the acceptable methods for the computation of a "weighted average cost of natural gas shrinkage." Where the increased costs associated with several volumes of processed natural gas have been aggregated, the residue price which is used to determine the cost of natural gas shrinkage is a *weighted average of all the contract price terms under which the different volumes of processed natural gas are sold*. Ruling 1975–18, 40 Fed. Reg. at 55863, December 2, 1975 (emphasis added).

Clearly Subpart K should be read as a whole, and should not be arbitrarily segregated into parts which, standing alone, are meaningless.

Mobil, while making the same general argument with respect to the exclusion of the fixed-quantity contract price from the weighted average, also asserts that it should not be judged on the basis of a factual situation different from its own. The regulations in question did not contemplate uniform contractual situations for all gas processors, but rather were premised on the assumption that the contractual situations would be varied. *See* 39 Fed.Reg. 32720, September 10, 1974. The fact that all of the gas processed at Mobil's Old Ocean plant is under contract does not in any way alter the interpretation of the regulations discussed above.

The court finds that the plaintiffs' "incremental method" was unreasonable under both Subpart E and Subpart K, and that the DOE interpretation is reasonable in light of its purpose.

## ARBITRARY AND CAPRICIOUS

All plaintiffs take the position that Subpart K, and the procedure used in promulgating this subpart, constituted arbitrary and capricious action on the part of DOE. The thrust of the argument is that in promulgating Subpart K, DOE failed to take into account the fixed-quantity contracts, and that these contracts are so imperative to the determination of shrinkage costs that the agency's failure to explicitly consider them renders the regulations void under *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (hereinafter *"Airbags"*). In the *Airbags* case, the Supreme Court held the revocation of a safety standard requiring passive restraints in cars arbitrary and capricious. Motor Vehicle Safety Standard 208, promulgated pursuant to the National Traffic and Motor Vehicle Safety Act of 1966, required automobile manufacturers to install either of two passive restraint devices: airbags or seatbelts. The industry planned to comply by installing seat-

belts in 99% of the cars produced. *Id.* at ——, ——, 103 S.Ct. at 2864. The agency later concluded that the seatbelts would not achieve the anticipated safety results because they could be detached, and completely rescinded the regulation. Since the agency itself had previously determined that airbags would achieve the desired results under the Motor Vehicle Safety Act, the Court held that the rescission of Standard 208 without even considering the airbag option was arbitrary and capricious. *Id.* at ——, ——, 103 S.Ct. at 2868, 2869.

When Subpart K was promulgated, however, the DOE considered the analogous relevant factors. As stated in the Preamble, "... there is no single ideal solution to the regulation of natural gas liquid prices, and the regulations adopted by the FEA today are a necessary compromise among the conflicting considerations which must be taken into account.... [T]he fundamental objective is to permit prices that will be as low as reasonably possible without adversely affecting the availability of the product." 39 Fed.Reg. 4408, December 24, 1974. To achieve this dual-objective, the agency considered several approaches: price ceilings, profit margin limitations, and a flexible price based on varying costs of gas and crude oil. *Id.* These are the crucial considerations. Fixed-quantity contracts are not to Subpart K as airbags are to Standard 208. Fixed-quantity contracts are only one aspect of one of these alternative price control alternatives. The Supreme Court made this clear in *Airbags* by stating that "... a court may not impose additional procedural requirements upon an agency... Nor do we broadly require an agency to consider all policy alternatives in reaching a decision. It is true that a rulemaking cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable

by the mind of man ... regardless of how uncommon or unknown that alternative may have been." *Id.* at ——, 103 S.Ct. at 2870–71, *citing Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1977). In this case, the plaintiffs' contention would impose insurmountable requirements upon DOE. Requiring consideration of each specific contract in effect would force executive agencies to foresee every conceivable contingency and would effectively preclude them from rulemaking. The court finds that the agency did not act arbitrarily or capriciously in the promulgation of Subpart K.

## ONE–HOUSE VETO

Finally, in a motion for summary judgment, Exxon asserts that the Acts in question, the EPAA and the EPCA, 15 U.S.C. §§ 751, *et seq.,* are invalid because they contained a one-house veto provision, declared unconstitutional by the Supreme Court in *Immigration and Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).[7]

In the *Chadha* case, the statute in question contained a severability clause, thus only the veto provision itself was invalidated. Further in *Chadha,* the veto provision was actually exercised to the detriment of the plaintiff. The Supreme Court emphasized the fact that *exercise* of the veto was a legislative function, and thus violated Article I.[8] In this case, however, no veto has been exercised over the regulations in question. A substantial constitutional question exists as to whether a retained veto provision, though unexercised, falls under the *Chadha* decision. The fact that a district court has held such a retained veto provision unconstitutional makes the issue no less substantial. *EEOC v. All-*

---

**7.** The veto provisions in the EPAA and EPCA pertained only to certain provisions giving the President decontrol authority.

**8.** "Examination of the action taken here by one House pursuant to § 244(c)(2) reveals that it was essentially Legislative in purpose and effect ... The one-House veto operated in this case to

overrule the Attorney General and mandate Chadha's deportation; absent the House action, Chadha would remain in the United States. Congress has *acted* and its action has altered Chadha's status." *Id.* —— U.S. at ——, 103 S.Ct. at 2784–85 (emphasis supplied).

*state Insurance Co.*, 570 F.Supp. 1225 (S.D.Miss.1983). The far-reaching implications of invalidating statutes which merely contain one-house veto provisions are hardly settled by this Mississippi court opinion. Further, in this case, Congress does not have the power to veto the regulations in question. Whether Exxon has standing to raise the issue is thus closely intertwined with the constitutional question. Both the constitutionality of the Acts and the standing question depend on the limits the Supreme Court places upon the *Chadha* decision.

Therefore, pursuant to 12 U.S.C. § 1904 note (§ 211), the substantial constitutional issues raised by Exxon's motion for summary judgment are certified to the Temporary Emergency Court of Appeals.

## CONCLUSION

For the reasons stated above, the court finds that:

1. Both the plaintiffs' intra-firm transfer price method and alternative incremental method are unreasonable under Subpart E.

2. DOE's interpretation of Subpart K is reasonable in light of the purpose of Subpart K.

3. The plaintiffs' exclusion of fixed-quantity contracts from the calculation of the weighted-average cost of shrinkage is unreasonable under Subparts E and K. In short, the weighted average cost of shrinkage reflects what processors were receiving under contracts in effect for their processed gas; and under either Subpart E or Subpart K, the exclusion of fixed-quantity contracts overstates what was actually received and is thus contrary to the purposes of the regulations.

4. DOE's promulgation of Subpart K was not arbitrary and capricious.

5. The one-house veto provisions in the EPAA and EPCA present substantial constitutional questions.

6. The court has considered the relevant agency rulings and interpretations and, as discussed in the original Memorandum Opinion, finds that they support rather than refute DOE's position in this case.

7. The material and ultimate facts in this case are not in dispute.

Therefore:

The Motion of Texaco Inc. for a New Trial is denied.

The Motion of Mobil Oil Corporation and Mobil Oil Exploration and Producing Southeast, Inc. for New Trial or in the Alternative for Clarification is denied.

The Motion of Exxon Corporation to Clarify Memorandum Opinion Concerning Subpart E is denied.

The Motion of Exxon Corporation to Vacate Findings of Fact and Conclusions of Law Concerning Subpart K and to Substitute Other Findings of Fact and Conclusions of Law is denied.

The Motion of Exxon for Partial Reconsideration in Light of Intervening Supreme Court Opinion and Misapprehension of Parties' Positions is denied.

Exxon's Supplemental Motion for Summary Judgment presents substantial constitutional questions and is certified to the Temporary Emergency Court of Appeals.

In accordance with the Memorandum Opinion issued June 24, 1983, the plaintiff's Motion for Summary Judgment with regard to the ethane exclusion is granted, and the defendants' corresponding motion is denied. The defendant's Motion for Summary Judgment on all other issues is granted, and the plaintiff's motion denied.

The attorneys will confer and submit a judgment in accordance with this order. Such judgment shall include the certification of the constitutional issues to the Temporary Emergency Court of Appeals and shall be submitted to the court for entry on or before December 15, 1983.

## SUPPLEMENTAL MEMORANDUM

Plaintiff Texaco claims that it has reserved its estoppel issue based on the Lar-

ry White "incremental costing letter." This court, however, has already disposed of the issue. The June 1983 Memorandum Opinion held that the Larry White letter was "in the nature of informal advice by agency employees which [does] not have the stature of official agency interpretations through DOE's Office of General Counsel and accordingly, are to be accorded little weight for purposes of regulatory interpretation." Memorandum Opinion, p. 7 *citing Pennzoil Co. v. United States Department of Energy,* 680 F.2d 156, 171 (TECA 1982). Plaintiff Texaco again raised the Larry White letter issue in its Motion for New Trial. In that motion and brief, Texaco did not mention its purported reservation of the estoppel issue. This court, in the November 1983 Memorandum Order, specifically denied Texaco's Motion for New Trial. Memorandum Order, p. 19.

The key to the issue is the fact that Texaco could not justifiably rely on agency advice without seeking a formal agency interpretation. This point is made clear in the *Pennzoil* case. *See Pennzoil Co. v. United States Department of Energy* at 179. The estoppel argument was therefore rejected by the court in both opinions.

Plaintiff Texaco further contends that the estoppel issue was not before the court because the defendants' Cross Motion for Summary Judgment which requested judgment on all issues raised in the plaintiffs' Joint Amended Complaint, was not ever received by plaintiff Texaco. Texaco received the defendants' Brief in Support of their Cross Motion for Summary Judgment on August 9, 1981, yet did not complain about not being served with the motion, and on October 25, 1983, counsel for Texaco appeared at the hearing in Abilene on the pending motions for summary judgment and did not mention the lack of service. Therefore, the judgment to be entered in this case granting the defendants' Motion for Summary Judgment in all but one instance shall be a judgment overruling and denying the estoppel issue as raised by Texaco.