EXXON CORPORATION, and Texaco, Inc., Plaintiffs-Appellants and Cross Appellees,

v.

UNITED STATES DEPARTMENT OF ENERGY, and Donald P. Hodel, Secretary of Energy, Defendants-Appellees and Cross Appellants.

Nos. 5–104, 5–105, 5–107, and CA–3–75–0836–W.

Temporary Emergency Court of Appeals.

Argued Sept. 27, 1984.

Decided Dec. 17, 1984.

Michael J. Henke, Washington, D.C., with whom C. Michael Buxton and Thomas A. Stout, Jr., Vinson & Elkins, Washington, D.C., and Stephen H. Bard, White Plains, N.Y., of Counsel, Texaco Inc., were on the brief for plaintiff-appellant and cross appellee Texaco Inc.

M.W. Parse, Jr., Houston, Tex., with whom A. Frank Koury, Fulbright & Jaworski, Houston, Tex., Keith A. Jones, Fulbright & Jaworski, Washington, D.C., and W.J. McAnelly, Jr. and Edward de la Garza, Exxon Corporation, Houston, Tex., were on the brief for plaintiff-appellant and cross appellee Exxon Corp.

Don W. Crockett, with Larry P. Ellsworth, John L. Gurney and Robert J. Wehrle-Einhon, Dept. of Energy, Washington, D.C., and Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D.C., were on the brief for defendants-appellees and cross appellants Dept. of Energy.

Before CHRISTENSEN, WILLIAM H. BECKER and BROWN, Judges.

## MEMORANDUM DECISION

CHRISTENSEN, Judge.

### THE PROBLEM

A natural gas stream as it is produced from a gas reservoir is a mixture of natural gas liquids (NGLs)[1] and methane.

---

**1.** Natural gas liquids (NGLs) and their products (NGLPs) include propane, butane, natural gasoline and ethane. In *Mobil Oil Corp. v. Federal Energy Administration,* 566 F.2d 87, 88 (Em. App.1977), we held that the agency had authority "to regulate the allocation and pricing of all liquid petroleum products recovered from the 'wet' natural gas streams, including condensation, natural gas liquids and natural gas liquid products recovered at gas processing plants . . .

When a producer extracts NGLs from this "wet" gas stream instead of marketing it as such, volumetric (Mcf), and thermal (Btu) values of the stream are reduced. "Subpart K" and "Subpart E" (as later harmonized with Subpart K retroactively) of the regulations under the Emergency Petroleum Allocation Act (EPAA) first recognized this "shrinkage" as a product cost for authorized recovery through increases in maximum allowable prices of NGLs and NGLPs above base levels.

How the cost of shrinkage was to be measured for this purpose is what the appeal of Exxon Corporation and Texaco, Inc., largely is about, with a related problem presented on the cross-appeal of the Department of Energy (DOE) concerning the "ethane exclusion rule" allocating a part of such shrinkage costs to exempt ethane for the purpose of constricting their pass-through to costs of covered products.

### THE CASE

These consolidated actions were initiated in the Northern District of Texas when, in June 1975, Dorchester Gas Producing Company and an affiliated firm filed a pre-enforcement declaratory judgment suit against the Department of Energy (DOE) and Exxon filed a similar action in July 1975. Later the cases were consolidated. Texaco, Inc., Mobil Oil Corporation, Phillips Petroleum Company and Pennzoil Company intervened as additional plaintiffs. All plaintiffs in these proceedings other than Exxon, Texaco and Mobil were dismissed in the district court by reason of stipulated settlements. Similar suits were filed in the same district by Cities Service Company and Amoco Production Company which also were dismissed following settlements.[2]

After extensive discovery, the parties filed cross-motions for summary judgment. In a comprehensive memorandum opinion, Chief Judge Halbert O. Woodward "granted summary judgment" in favor of the Department of Energy on all issues except that of the validity of the ethane exclusion rule, as to which summary judgment "was granted" in favor of plaintiffs. *Dorchester Gas Prod. Co. v. U.S. Department of Energy*, 582 F.Supp. 911 (N.D.Tex.1983).

Plaintiffs filed various motions for new trial or reconsideration. Exxon moved to have certified to this court the question whether the EPAA and the Energy Policy and Conservation Act were unconstitutional by reason of their legislative veto provisions. The district court following further briefing and argument filed on November 23, 1983, a "Memorandum Order" reexamining and reaffirming its rulings on the issues now before us and certifying the constitutional question to this court pursuant to section 212 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. *Dorchester Gas Prod. Co. v. U.S. Dept. of Energy*, 582 F.Supp. 927 (N.D.Tex.1983).

▪ The District Judge enumerated the following conclusions in his Memorandum Order, 582 F.Supp. 927 at 937:

1. Both the plaintiffs' intra-firm transfer price method and alternative incremental method are unreasonable under Subpart E.

2. DOE's interpretation of Subpart K is reasonable in light of the purpose of Subpart K.

3. The plaintiffs' exclusion of fixed-quantity contracts from the calculation of the weighted-average cost of shrinkage is unreasonable under Subparts E

---

except ethane, which is expressly exempted from regulation by Section 3(6) of the Act." *See also Nat. Helium Corp. v. Federal Energy Administration*, 569 F.2d 1137 (Em.App.1977).

**2.** The agency filed enforcement actions in the United States District Court for the District of Columbia against nine refiners, including the appellants before us, alleging that they had im-

properly computed increased costs for NGLs. These cases were stayed pending the resolution of the Texas actions and another case then pending in the District of Delaware involving different issues, later decided against the Department of Energy and affirmed by this court in *Gulf Oil Corp. v. Department of Energy*, 671 F.2d 485 (Em.App.1982).

and K. In short, the weighted average cost of shrinkage reflects what processors were receiving under contracts in effect for their processed gas; and under either Subpart E or Subpart K, the exclusion of fixed-quantity contracts overstates what was actually received and is thus contrary to the purposes of the regulations.

4. DOE's promulgation of Subpart K was not arbitrary and capricious.

5. The one-house veto provisions in the EPAA and EPCA present substantial constitutional questions.

6. The court has considered the relevant agency rulings and interpretations and, as discussed in the original Memorandum Opinion, finds that they support rather than refute DOE's position in this case.

After denying the various motions for new trial and reconsideration he added: "In accordance with the Memorandum Opinion issued June 24, 1983, the plaintiff's Motion for Summary Judgment with regard to the ethane exclusion is granted, and the defendants' corresponding motion is denied. The defendant's Motion for Summary Judg-

ment on all other issues is granted, and the plaintiff's motion denied." [3]

Finally, the district court filed a supplemental memorandum rejecting Texaco's estoppel contention as barring summary judgment disposition. *Dorchester Gas Prod. Co. v. U.S. Dept. of Energy*, 582 F.Supp. 927 at 937 (N.D.Tex.1983).

Separate appeals were taken by the remaining plaintiffs [4] concerning the issues now before us and DOE filed a cross-appeal as before indicated. The appeals were consolidated here but briefing on the merits was delayed pending determination of the constitutional question. On July 6, 1984, we held with respect to the certified issue that the inclusion of the legislative veto provisions did not render the remainder of the Acts unconstitutional. *Exxon Corp. v. Dept. of Energy*, and *In Re: The Department of Energy Stripper Well Exemption Litigation*, 744 F.2d 98 (Em. App.), *cert. denied*, — U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984). *See also Gulf Oil Corp. v. Dyke*, 734 F.2d 797 (Em.App.), *cert. denied*, — U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984).

---

**3.** Counsel were directed to confer and submit a judgment in accordance with the Memorandum Order. The same day a "Judgment" (the record does not indicate whether this was the form submitted by counsel) was signed, simply reiterating the "granting" or "denial" of the respective motions and ordering that the "joint amended ... complaint is dismissed with prejudice." The parties respectively appealed therefrom. The case was briefed, argued and submitted in this court without any question arising concerning the form of judgment.

In preparing this opinion we have found a troublesome interplay among the "final decision" requirement of 28 U.S.C. § 1291, the reference to "judgment" in rule 15 of our own rules, the separate-document requirement of Rule 58, Fed.R.Civ.P., the "declaratory" element inhering in the concept of a declaratory judgment, and some suggestion among the authorities that the granting or denial of a motion is not necessarily equivalent to a final decision for the purposes of appeal. *See, e.g., Yeager v. Drug Enforcement Administration*, 678 F.2d 315, 319, n. 10 (D.C. Cir.1982).

After examining our appellate jurisdiction in compliance with our continuing duty to do so,

*Exxon Corp. v. Federal Energy Admin.*, 516 F.2d 1397 (Em.App.1975), we have concluded that we properly can and should treat the judgment of December 21, 1983, as incorporating the declarations of fact and law in the court's memorandums as the trial court and the parties have, and that, as such, it constitutes an appealable decision over which this court has jurisdiction. *Athenian Realty Corp. v. Southwestern Bell Tel. Co.*, 338 F.2d 1001 (5th Cir.), *cert. denied*, 380 U.S. 953, 85 S.Ct. 1086, 13 L.Ed.2d 970 (1964). *See also Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978); *U.S. v. Schaefer Brewing Co.*, 356 U.S. 227, 78 S.Ct. 674, 2 L.Ed.2d 721 (1958); *United States v. Hark*, 320 U.S. 531, 64 S.Ct. 359, 88 L.Ed. 290 (1944). *Cf. Bragg v. Reed*, 592 F.2d 1136, 1138 (10th Cir. 1979).

**4.** Upon stipulation filed August 13, 1984, Mobil Oil Corporation's appeal was dismissed and Mobil was dismissed as a party to the Department of Energy's cross-appeal, leaving Exxon and Texaco as the appellants now before us. They will be referred to generally hereafter as "the appellants," and the appellees/cross-appellants will be referred to as "DOE."

## FACTUAL AND REGULATORY BACKGROUND [5]

Approximately 800 gas plants were operating in the United States during the relevant period. When natural gas from a particular lease was dedicated exclusively to one customer under a reserve commitment contract, as ordinarily was the case,[6] that customer had the right to take the additional gas that would have been available in the absence of proceeding. But residue gas was sometimes sold under fixed-quantity contracts, leaving processors in varying circumstances free to market incremental quantities to the same or other customers under surplus contracts or on the open market. The present litigation has arisen because of the latter circumstances.

Natural gas from which NGLs and NGLPs are produced, as distinguished from the products themselves, was never subject to price controls, being expressly exempted from regulation by the original Phase IV rules. 38 Fed.Reg. 22536, 22538 (Aug. 22, 1973). Ethane was statutorily exempt under the EPAA (§ 3(1)(A), (6), 15 U.S.C. § 752(1)(A), (6)). Other NGLs and NGLPs were covered by the controls of Subpart E,[7] but no method had been adopted expressly for calculating their increased product costs, and the shrinkage disincentive for their production had not been dealt with by the agency.

Subpart E was oriented mainly toward crude oil refiners. Adjustment of the maximum lawful selling prices for refined products from the price levels of May 15, 1973, could be made on the basis of increased costs of raw materials used to produce them after that date. Increased costs then could be allocated among the refined products sold. Only a *pro rata* share could be allocated to certain special products, but there was no limit for allocations to other products, including NGLs and NGLPs. Because of such unlimited allocation to propane, resultant price increases imposed excessive hardship on consumers.

The Federal Energy Administration accordingly adopted a "Special Propane Rule" prohibiting refiners from allocating more than a *pro rata* share of increased crude oil costs to propane based upon the ratio of its total sales volume to the total sales volume of all covered products. 39 Fed.Reg. 4450 (Feb. 1974).

In the preamble to the amendment the FEA stated:

> The emergency special propane rule further provides that no increased costs may be calculated by refiners for domestic natural gas liquids and propane which are acquired from an affiliated entity ... [I]ncreased costs of natural gas liquids have generally been minimal and there has been no precise method for passing any increased costs through in the present regulations. The FEA is aware of the need for improving its regulations in this area and will be proposing amendments for this purpose in the immediate future. In the meantime, the amount of increased product costs which may be passed through by refiners is subject to the general principle that such increased costs are limited to those cost increases which reflect payment of lawful prices.

Addressing the need thus perceived, the FEA on September 10, 1974, proposed the addition of a new Subpart K to regulate the costing and pricing of NGLs and NGLPs with the objective of maintaining prices "as low as is reasonably possible without adversely affecting the availability of the product." 39 Fed.Reg. 32719 (1974). After receiving comments from the industry and conducting public hearings, the

---

5. Regulatory references unless otherwise indicated are to the designations current during the relevant times, because price controls now have expired.

6. DOE audits revealed that Exxon had approximately 88 gas plants, Texaco 108. Appellants do not claim any problem in computing the cost of

natural gas shrinkage pursuant to Subpart K where this normal situation existed.

7. "Subpart E" refers to Subpart E of Part 212 of Title 10, C.F.R. ("Refiners"). "Subpart K," hereinafter discussed, refers to Subpart K of Part 212 of Title 10, C.F.R. ("Natural Gas Liquids").

agency on December 24, 1974, published the new Subpart K, effective January 1, 1975. 39 Fed.Reg. 44407 (1974).

The preamble to Subpart K, after reviewing problems concerning a cost-based system and other alternatives, stated:

As the foregoing summary indicates there is no single ideal solution to the regulation of natural gas liquid prices, and the regulations adopted by the FEA today are a necessary compromise among the conflicting considerations which must be taken into account. As stated in the September 10 Notice, the fundamental objective is to permit prices that will be as low as reasonably possible without adversely affecting the availability of the product. The adverse effects of price disparities stemming from the differing costs of crude oil and natural gas on the distribution sector of the industry, and the added demand for natural gas liquid products priced at less than the price for BTU equivalent crude petroleum derived products, were also among the problems adverted to by the FEA in its September 10 Notice. A further important consideration in this proceeding is that the FEA must ensure, to the maximum extent practicable, that its regulations do not have an undue adverse impact on any particular segment of the industry, and that established relationships and operations in the industry are not unnecessarily disrupted.

\* \* \* \* \* \*

*V Increased cost of natural gas shrinkage*—For natural gas processing, the equivalent of increased product cost is the increase in the cost of the "shrinkage" which occurs in the natural gas stream from which the liquids are extracted, as a result of the extraction of the liquids. The "cost" of such shrinkage is the reduction in sales revenues received from the natural gas because of the reduced gas volume or BTU content of the gas after processing. Where the price permitted to be charged for natural gas has increased since May 15, 1973, an increased cost of "shrinkage" resulting

from extraction of the liquids has been the result. The FEA has determined that this cost increase is the equivalent of increased product cost, and shall therefore be permitted to be passed through in the prices charged for natural gas liquid products so that the economic incentive to remove the liquids from the natural gas stream will not be lost.

39 Fed.Reg. 44408, 44409 (Dec. 24, 1974).

Subpart K itself allowed processors to pass through natural gas shrinkage as an "increased product cost" by these provisions:

(a) The first sale price of natural gas in liquids or natural gas liquid products may be increased in each month as provided in § 212.167, to reflect on a dollar for dollar basis, increased product costs since May 1973 attributable to the production of such natural gas liquids or natural gas liquid products.

(b) Increased product costs are ... (3) the difference between the weighted average cost of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the month of May 1973, and the weighted average cost of natural gas shrinkage per thousand cubic feet (MCF) of natural gas processed in the current month, multiplied by the number of thousand cubic feet (MCF's) of natural gas processed in the current month.

10 C.F.R. § 212.167(a), (b) (1979), previously numbered § 212.166(a), (b).

"Cost of shrinkage" was defined in the definitional subsection of Subpart K as

[t]he reduction in selling price per thousand cubic feet (MCF) of natural gas processed, which is attributable to the reduction in volume or BTU value of the natural gas resulting from the extraction of natural gas liquids, as determined pursuant to the contract in effect at the time for which cost of natural gas shrinkage is being measured, and under which the processed natural gas is sold.

10 C.F.R. § 212.162.

Included in Subpart K was the so-called ethane exclusion rule requiring a volumet-

rically proportionate allocation of the cost of natural gas shrinkage to ethane. The principle of volumetric cost allocation had been utilized earlier in 10 C.F.R. § 212.-83(c)(2) which required volumetrically proportionate allocation of crude oil costs to exempt products derived from crude oil. We held the incorporation of the "V-factor" in this earlier regulation substantively and procedurally invalid in *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796 (Em. App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). When cross-appeal issues involving the ethane exclusion rule of Subpart K are later discussed, we shall review its antecedents more particularly.

Subpart K coped with the problem of gas producers only prospectively. To rectify the earlier harsh effects of Subpart E on most gas processors, particularly small independents, the agency later adopted a Class Exception, 40 Fed.Reg. 23320 (May 29, 1975), which among other things allowed processors to adjust retroactively their banks of unrecovered cost increases to reflect the adjusted base period pricing first permitted by Subpart K. At the same time, it issued Ruling 1975–6, 40 Fed.Reg. 23272 (May 29, 1975), indicating that it would not enforce the restrictive provisions of Subpart E which had prevented most gas processors from legally charging more than their May 15, 1973, prices. In doing so it stated that "where the natural gas sales revenues are reduced by processing and where the selling price of the natural gas that has been processed has increased since May 15, 1973, the cost of shrinkage resulting from extraction of the liquids will also have increased [and will be considered] 'an increased product cost' under § 212.83 [of Subpart E]." *Id.* 23273.

During the Subpart E period, and until 1976, Texaco used an interaffiliate transfer pricing method of calculating increased

costs to be discussed hereafter. During 1976 and early 1977, it used the weighted-average method of calculating cost of shrinkage as advocated by DOE, considering the sales price for all of its gas contracts, including fixed-quantity contracts and contracts for the sale of surplus gas. In May 1977, Texaco began using an "incremental method"; that is, it calculated shrinkage costs based on higher priced surplus contracts for the relevant month, excluding from the calculation the price received during the month under satisfied fixed-quantity contracts. In December 1978, it refiled to claim increased costs for the period prior to May 1977 entirely on the basis of its incremental method.

Exxon passed through no increased costs for NGLs during August, September and October 1973. During November 1973 through March 1974, it computed increased costs under a formula permitted for old crude oil. In April 1974, it again changed methods and until December 1974 utilized a transfer pricing method based on its historical system of accounting. This formula utilized Exxon posted prices for propane and motor gasoline. Exxon refiled, seeking to make this transfer pricing method effective from November 1973. During the Subpart K period, Exxon employed the incremental method of calculating shrinkage which appellants espouse on this appeal.

## THE ISSUES ON APPEAL

The parties do not question that the case was ripe for dispositive summary judgment, except for Texaco's contention that its estoppel claim was not subject to resolution against it in the absence of trial. Other issues were argued in the district court by the present appellants or other parties no longer involved which were not preserved for review.[8] Thus the issues presented on this appeal are these:

---

**8.** Appellants have abandoned among other contentions advanced in the district court their attack upon the procedural validity of "Subpart K," aside from the Ethane Exclusion Rule the validity and interpretation of which is sharply

at issue on this appeal along with the interpretation of other provisions of Subpart K.

No issue was raised either in the district court or on appeal concerning the propriety of the declaratory judgment remedy in the context of

I. Did the district court err in construing Subpart K as requiring the cost of natural gas shrinkage to be calculated by using the weighted-average price of all residue gas sales contracts (including "satisfied fixed-quantity contracts"), rather than disregarding the latter and looking solely to other contract prices appellants could have received if the gas had been sold without processing?

II. Did the district court err in granting summary judgment for DOE in the face of Texaco's claim that the agency was estopped from denying the propriety of Texaco's costing method in view of advice from DOE personnel?

III. Did the trial court err in construing Subpart E as precluding calculation of NGL increased product costs either by appellants' "incremental costing" theory (ignoring the satisfied fixed-quantity contracts) or by reference to transfer prices for NGLs determined in accordance with generally accepted accounting practices?

IV. Did the district court err in determining that appellants were not guilty of laches and thus barred from questioning the ethane exclusion rule?

V. Did the district court err in finding the latter rule to be invalid by reason of a prior decision of this court and, if so, should the issue of the rule's validity be resolved here, or by the district court in the first instance upon remand?

## DISCUSSION

■ Appellants maintain that fixed-quantity contracts existing during the period of measurement were irrelevant for the purposes of the shrinkage formula; that DOE's position is contrary to the congressional mandate that price regulations allow a dollar-for-dollar passthrough in net cost increases to covered products under 15 U.S.C. § 753(b)(2)(A), and that it would have extinguished economic incentive for NGL extraction, thus violating the purposes of the EPAA and regulations promulgated thereunder. Their present position is that the "relevant" prices on the basis of which shrinkage could be calculated were those contained in surplus contracts under which sales would have been made had there been no shrinkage or upon the extension of prices actually collected for a limited quantity of residual gas sold under surplus contracts to the larger quantities that might have been sold had there been no shrinkage.

DOE suggests that appellants did not present their present theory in the court below; that there they argued that shrinkage costs should be based upon the market or upon unregulated prices for which the remaining gas could have been sold without the constraints of even surplus contract prices. It does seem that on this appeal appellants have moved more particularly toward the language of Subpart K by emphasizing that their incremental costing or "opportunity" method is based on sales that could have been made under higher-priced surplus contracts in existence during the month of measurement. But we regard this different emphasis as merely a variation upon a theme; their present position was broadly included in contentions before the district court.[9]

this preenforcement action and we, therefore, express no opinion on the point. See *Texas Energy Reserve Corp. v. Dept. of Energy,* 710 F.2d 814 (Em.App.1983); *Hawthorne Oil & Gas Corp. v. Department of Energy,* 647 F.2d 1107 (Em.App.1981). *Cf. Department of Energy v. State of Louisiana,* 690 F.2d 180 (Em.App.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

9. Appellants described in the district court their theory for calculating natural gas shrinkage as follows:

In losing that opportunity [to sell the shrinkage volume as natural gas], the gas processor forfeits the revenues he could have obtained by selling the shrinkage volume as gas. The actual cost of this lost opportunity can appropriately be measured only by ascertaining the price at which the *additional, incremental volumes* of gas would have been sold if not used up to make the liquids—i.e., the true opportunity cost, sometimes referred to as the "incremental cost." To put it more concretely, the actual value of shrinkage can only be determined by looking to *relevant* prices (those at which the shrinkage volumes could have been sold) and eliminating all *irrelevant* prices (those at which the shrinkage volumes would

Recognizing, as this court has done so frequently, the deference to be accorded interpretations by an agency of its own regulations when not plainly erroneous, *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the district court stated:

It is the opinion of the court that DOE's interpretation requiring a weight-averaging of the sales of residue gas under all existing contracts during the current month, including existing long-term, fixed-price contracts, for purposes of determining cost pass throughs to NGL prices is neither plainly erroneous nor contrary to the regulatory language and should be given deference.

582 F.Supp. at 915–16.

The validity of Chief Judge Woodward's reasoning, which we need not here recite in detail, becomes even more apparent upon further analysis of appellants' "opportunity costing" concept.

## "OPPORTUNITY COST" AS THE "ROOT CONCEPT"

Texaco uses for the caption of its related argument the phrase "Opportunity Cost— The Root Concept," asserting that in spite of a general acceptance of the opportunity costing principle in Subpart K, and in its interpretations, DOE's position has become "one of rejecting opportunity costing itself." [10]

In a broad sense the very idea of shrinkage as an element of product cost must be based upon "opportunity" rather than actuality to be meaningful. "Shrinkage" itself

ceases to exist as it occurs. The opportunity to sell the hydrocarbons lost through shrinkage would also be lost—indeed was—unless in the regulatory plan some substitute for it could be recognized as an element of product cost in pricing the residue. In this sense, "lost opportunity" was basic to Subpart K.

But to stretch this concept to control not only the allowance of shrinkage for costing purposes, but also its measurement, contrary to the regulatory language establishing a specific standard for the latter purpose, is quite another thing. Examination of appellants' references demonstrates that the concept of lost opportunity cost does not necessarily control the quantification of shrinkage, as distinguished from its allowance, and cannot do so in view of the language of the regulation.

*MGPC, Inc.*, 11 DOE ¶ 83,009 (July 22, 1983), *supra*, held among other things that "the use of the residue gas sales price received by MGPC," despite complications in connection with the "one firm" rule, was consistent with the notion of opportunity cost which "is at the root of the allowable shrinkage cost." We do not assume to pass upon the validity of that particular ruling. We recognize that in some such contexts the allowance and measurement of shrinkage elements may almost merge. But we see nothing to support appellants' contention that surplus contracts under which sales have not been made during the month of measurement can provide the sole basis for calculating shrinkage pursuant to

---

*not* have been sold). [Footnote omitted] [Emphasis in original.]
R. 2799.

**10.** Opportunity Cost—The Root Concept

The dominant theme of DOE's brief is its persistent failure to embrace and accord recognition to the opportunity cost concept which lies at the heart of the shrinkage principle. It is accepted by all parties that the Subpart K shrinkage provisions embody an opportunity cost concept. *See MGPC Inc.*, 11 DOE § 83,009 at p. 86,080 (1983) ("'opportunity cost' ... is at the root of allowable shrinkage costs"); *Placid Oil Co.*, Interpretation 1979–2M, 44 Fed.Reg. 39376, 39378

(1979). DOE admits as much in its brief here, just as it did in the court below. *See* DOE Br. 15 ("the FEA decided to use an 'opportunity cost' concept to define NGL product costs"); R. 4339. Moreover, DOE explicitly recognizes that an opportunity cost *"by definition* converts anticipated [lost] *revenue* (including profit)" into a cost. DOE Br. 5, n. 4 (first emphasis added). Yet throughout its brief DOE steadfastly refuses to accept and apply *its own definition of its own concept.* Ultimately, DOE's position becomes one of rejecting opportunity costing itself. [Footnote omitted.] [Emphasis in original.]
Texaco's Reply Br. at 1.

Subpart K. On the contrary, the decision refers basically to Ruling 1975–6 as a statement of the weighted-average price rule contemplated by Subpart K, and to the language of 10 C.F.R. § 212.162 dealing with "contracts in effect at the time for which natural gas shrinkage is being measured and under which the processed natural gas is sold." Ruling 1975–6 had determined among other things that "the cost of shrinkage shall be determined by comparing the value of natural gas prior to processing with the value of the natural gas after processing" and that "[t]he value of the natural gas stream for this purpose shall be computed by reference to the contractual terms in effect for the sale of ... 'residue' natural gas during the relevant month." 40 Fed.Reg. 23272, 23273–4.

Far from supporting the plaintiff's position, *Placid Oil Company* Interpretation 1979–2M, 44 Fed.Reg. 39376 (1979), related the expression "increased shrinkage 'costs'" as compensation for "lost opportunities" to the allowance of shrinkage as a product "cost" rather than to its "measurement," clearly differentiating the two matters.[11]

The agency concluded on this point in language especially instructive here:

> While the opportunity costs described as increased shrinkage costs are the equivalent of increased product costs, such "costs" do not represent outlays of dollars and therefore cannot be recouped on an exact dollar-for-dollar basis. *Kansas-Nebraska Natural Gas Co.*, Interpretation 1978–41, 43 FR 29548 (July 10, 1978). Section 4(b)(2)(A) of the EPAA does not require that Placid be permitted to impute a value in dollars on residue gas not sold, which value may then be employed in shrinkage calculations.
>
> ... [I]ncreased shrinkage costs are recognized for cost computation and allocation only when the gas sales revenues due to extraction are lost, i.e., when the residue gas is sold. Prior to that time, there is no guarantee that the gas will be sold and that a firm will incur any lost opportunity cost.

44 Fed.Reg. 39378.

In the *Kansas-Nebraska* Interpretation, *supra*, the distinction between allowance of opportunity costs and their measurement was painstakingly explained by the agency.[12]

11. Thus, increased shrinkage costs are designed to permit recoupment in NGL prices of the reduction in sales revenue resulting from the contractual price terms in the relevant month for that residue gas.

Increased shrinkage "costs" are a compensation for lost opportunities, i.e., opportunities to sell the natural gas without extracting the liquid content of the "wet" stream.

This opportunity cost is measured "by reference to the contractual terms in effect for the sale of [the firm's] 'residue' natural gas during the relevant month".... Subpart K now imposes the same general requirements for measuring shrinkage costs in § 212.166 which states in pertinent part:

"Cost of natural gas shrinkage" means the reduction in selling price ... *as determined pursuant to the contract in effect at the time for which cost of natural gas shrinkage is being measured, and under which the processed natural gas is sold.* [Emphasis in original.]

44 Fed.Reg. 39378.

12. While the opportunity costs described as increased shrinkage costs are the equivalent of increased product costs, such "costs" do not

represent outlays of dollars and therefore literally be recouped on a dollar-for-dollar basis. Furthermore, the implicit extension of Kansas Nebraska's position is that all opportunity costs associated with the production of covered products must be recovered on a dollar-for-dollar basis. Such general application of § 4(b)(2)(A) would arguably render unlawful any price limitations preventing the opportunity to sell covered products at a price reflecting the "free market value" of the covered products in relation to unregulated products or activities theoretically available to the processor. Such a result would mean that the products generally must be priced at their current market value, a result incompatible with the very existence of price controls.... The Company argues that the method specified for calculating shrinkage costs, the "per Mcf" approach, will not always exactly coincide with the total gas sales dollar revenue foregone. Nevertheless, the fact that the method of valuing costs is not as precise in individual cases as could be formulated does not mean that the valuation method violates the dollar-for-dollar passthrough requirement. 43 Fed.Reg. 29550 (July 18, 1978).

The distinctions thus drawn and the principles applied were consistent with Ruling 1975–18, 40 Fed.Reg. 55863 (Dec. 2, 1975), which recognized in the year Subpart K became effective that the controlling weighted average applied to volumes of natural gas subject to differing sales contracts and that the residue price to be used to determine the cost of natural gas shrinkage, without reference to any broader "opportunity cost," was a weighted average of all the contract price terms under which the different volumes of processed natural gas were sold.

That DOE has conceded opportunity costing is at the root of allowable shrinkage and that the agency decided to use an "opportunity cost" concept to define NGL product costs thus is understandable. But the claimed further admission ascribed by Texaco to DOE "that an opportunity cost by definition converts anticipated [lost] revenue (including profits) into cost," is not warranted by citation in DOE's brief. In substance DOE said quite the contrary with *ad absurdum* emphasis.[13]

### PLAIN LANGUAGE

The definition of "cost of natural gas shrinkage" in Subpart K bases measurement of shrinkage upon a "contract in effect at the time for which cost of natural gas shrinkage is being measured, and under which the processed natural gas is sold." 10 C.F.R. § 212.162, *supra.*

This language plainly means that if there were a fixed-quantity contract in effect at the time of measurement under which the residue gas was sold it would have to be considered, along with any other outstanding contracts under which gas was sold during the measurement period in determining the cost of natural gas shrinkage. In our opinion, it would be an unreasonable construction, despite use of the singular, to say that in the case of several effective contracts only one would be considered as the rule provides, and another in the same situation disregarded.[14] Even plainer would be rejection by the language used of any idea that the contract to be disregarded was the one under which gas was sold during the month of measurement and a contract under which gas was not sold during the month of measurement was the one to be given controlling effect in the measurement of shrinkage.

Appellants argue that only their surplus contracts and not the fixed-quantity contracts under which gas was sold during the measurement period satisfied the criteria of subsection 162.[15] In rejecting this argument, the district court observed:

> When there are outstanding contracts—fixed quantity or otherwise—and a stream of gas enters a plant for processing, part of the BTU content that prices based on BTU value, the cost of "shrinkage" is to be computed based on the reduction in sales revenues from natural gas because of reduced BTU value attributable to gas processing, and where the natural gas processed is or was sold under contracts at prices based on the volume of gas, the cost of "shrinkage" is to be computed based on the reduction in sales revenues from natural gas sales because of reduced volume attributable to gas processing.
> 39 Fed.Reg. 4409, *supra.*

13. If a firm could "sell" propane (or any refined product) to itself at "market value," the entire cost-based price control system would be nullified. If "market value" became the measure of a firm's cost, then the firm's maximum lawful price would always exceed market value; an "opportunity cost" by definition converts anticipated *revenue* (including profit) into a fictitious "cost," so that maximum lawful prices based on costs may be bootstrapped upward without limitation. DOE br. p. 5 n. 4.

14. The preamble to Subpart K itself rejects any such notion for it refers to contracts in such context:
The cost of shrinkage shall be computed based upon the contractual terms in effect for the sale of natural gas during the time period for which shrinkage cost is being measured. Thus, in those cases where the natural gas processed is or was sold under contracts at

15. DOE asserts (br. pp. 20–22) that neither Texaco nor Exxon actually had any "surplus" contracts in effect under which they could have sold the surplus gas lost in processing. However, both Texaco and Exxon take the position on appeal that they did have such contracts. For purposes of this decision we will assume that they did.

could conceivably have gone toward satisfaction of those existing contracts is lost. In other words, the loss of revenues from processing actually pertains to *all* the existing contracts. Plaintiffs' theoretical attribution of the loss of revenue due to processing exclusively to surplus contracts is spurious; it is merely a rationalization for charging the highest price possible. [Emphasis in original.]

582 F.Supp. at 934.

The language of the regulation will not accommodate appellants' theory. The district court was quite right in determining that the agency's interpretation requiring a weighted average of sales of residue gas sold under all existing contracts during the current month, was not clearly erroneous or contrary to the language of the regulation. 582 F.Supp. at 934, 937. It would seem that such a construction is essentially compelled, but even were this not so, agency interpretations to this effect, being consistent with the language of the regulation, would be entitled to special deference on the record before us. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Pennzoil Co. v. United States Dept. of Energy*, 680 F.2d 156, 168–171 (Em.App.1982), *cert. dismissed*, 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983).

## FORMAL AGENCY INTERPRETATIONS

Ruling 1975–18, issued in December 1975, set out DOE's position with respect to the weighted-average method of calculating shrinkage costs, in agreement with the language of the regulation itself and in harmony with DOE's litigation position in this case:

> The purpose of requiring a "weighted average" cost comparison is to provide a method by which firms which have chosen, pursuant to § 212.167(b), to aggregate the total amount of increased product costs respecting volumes of natural gas subject to differing sales contracts which are processed in one or more plants, may calculate a single amount

representing the increased costs of natural gas shrinkage for the aggregate of volumes of natural gas processed. Accordingly, the above formulae provide the acceptable methods for the computation of a "weighted average cost of natural gas shrinkage." Where the increased costs associated with several volumes of processed natural gas have been aggregated, the residue price which is used to determine the cost of natural gas shrinkage is a weighted average of all contract price terms under which the different volumes of processed natural gas are sold.

Ruling 1975–18, 40 Fed.Reg. 55860, 55863 (December 2, 1975).

Exxon contends that this ruling did not address a situation where there were one or more "irrelevant" contracts. Again, this argument erroneously assumes that fixed-quantity contracts were irrelevant in determining shrinkage, which was precisely the issue upon which the trial court ruled against appellants and in our opinion correctly.

Texaco argues that section 212.167, interpreted by Ruling 1975–18, "does not address the basic calculation of the cost of shrinkage but pertains instead to a company's option to aggregate shrinkage costs separately calculated for different streams." It is true that subsection 167 does not itself mention "residue prices" but speaks in terms of "the weighted-average cost of natural gas shrinkage." However, Ruling 1975–18 does explicitly refer to the "residue price" used to determine natural gas shrinkage and defines it as "a weighted average of all the contract price terms under which the different volumes of natural gas are sold."

Appellants contend that two other formal agency interpretations do support their opportunity costing method and reject the weighted-average method of calculating shrinkage costs. We believe that these later interpretations, *Sun Gas Company* Interpretation 1978–37, 43 Fed.Reg. 29543 (July 10, 1978), and *Kansas-Nebraska* Interpretation 1978–41, 43 Fed.Reg. 29548

(July 10, 1978), were only tenuously in point and that they do not support appellants' position essentially for the reasons stated by Judge Woodward, 382 F.Supp. at 916–17. We would emphasize that in reaching its conclusion in the peculiar circumstance of the Btu adjustment contracts involved, the agency in *Kansas-Nebraska* expressly rejected the fundamental premise underlying appellants' position, as we have already pointed out in differentiating the allowance of shrinkage from its measurement in accordance with Subpart K.

We have considered, although we are not persuaded to the contrary by, the arguments set out in Exxon's "Post-Argument Correction of Misstatement of Fact [by DOE in oral argument]," DOE's response and Exxon's reply. Exxon there complains that DOE's counsel stated that during the relevant period Exxon had not been selling gas "pursuant to a contract that provided a higher price for additional gas that would have been available in the absence of processing." We have already indicated that for the purposes of our decision we have rejected such suggestion since it would involve a contested factual situation and in our view would be immaterial to the validity of the judgment under review. The district court decided that Subpart K required the processor to weigh average prices for residue gas sold under all contracts in effect, including surplus as well as fixed-quantity contracts, during the month of measurement, 582 F.Supp. at 934, and that is our view.

In a given month an appellant may have sold a particular quantity of residue gas under a surplus contract at a price higher than that at which residue gas was sold during the same month under a lower-priced, fixed-quantity contract, and the decision below permitted sales prices for all residue gas sold during the month of measurement to be weight averaged in accordance with the regulation. However, to count in this weight-averaging process not only the quantity of gas actually sold under surplus contract, but the additional quantity which appellants argue could have been sold at the higher price had it not been lost through shrinkage, would be in conflict with the plain language of the regulation. Another contention included in Exxon's submission following oral argument in this court that DOE had admitted its case away in the course of that argument is not persuasive.[16]

## INFORMAL INTERPRETATIONS BY DOE PERSONNEL

■ Appellants contend that the district court erroneously discounted informal agency advice tending to support their present position, including an "incremental costing letter" to Texaco from Larry White, DOE's Regional Director of Compliance for Region VI, the "Janowski Memorandum" and "Clarification 78–3." Only one of these writings bears sufficiently on the point at issue to warrant further comment.[17]

**16.** Exxon seizes upon a statement by DOE's counsel that "[t]he plaintiffs are correct in their description of *Kansas-Nebraska*."

It was obvious that DOE's counsel in accepting appellants' "description" of *Kansas-Nebraska* had reference to the context of the Btu adjustment clause dealt with there as it had been referred to in the oral argument of opposing counsel and on the basis of which DOE's counsel proceeded to distinguish the facts involved in that decision and the present case.

**17.** This letter among other things stated:

The information identified as "Case 2" is an example of Texaco's proposed method of "incremental pricing" in the calculation of increased shrinkage costs. In principle, we allow for audit purposes a "cost of shrinkage"

value which is equal to the revenues lost in residue gas sales because of the extraction of natural gas liquids. Realizing that this principle parallels your position, we do not anticipate at this time taking exception to the principle of your second, or proposed method of calculating shrinkage for your Floodway and Paradis plants on a prospective basis.... Please be advised that our acceptance of the principles expounded in your second method is based on information provided by you and is subject to change based on additional facts or further clarification. In order for you to have complete reliance on FEA's position, you must file a request for interpretation to the Office of General Counsel and we suggest that you immediately request such an interpretation. Therefore, this letter should not be con-

Texaco asserts that the White letter was "authorized" by the Office of the General Counsel, but the record does not bear this out. The letter itself indicates that for an authoritative answer resort would have to be had to the Office of the General Counsel. This presents a *Pennzoil* situation [18] of little or no significance under the circumstances of the present case. Beyond the oil company's general knowledge of the regulation requiring resort to the General Counsel's Office as in *Pennzoil,* the very communication on which appellants rely expressly cautioned against any reliance.

The trial court was correct in ruling that Texaco had no reasonable basis to rely upon informal comments of agency personnel and that DOE was not estopped from challenging Texaco's shrinkage calculations.[19]

## ARBITRARY AND CAPRICIOUS CONTENTION

■ Appellants contend that if DOE's weighted-average price methodology is to be given effect, the disputed provisions of Subpart K must be invalidated as arbitrary and capricious.

They allege that the weighted-average method conflicts with the agency's stated purpose in promulgating the shrinkage regulations, *i.e.,* to preserve economic incentive to extract NGLs by allowing a dollar-for-dollar pass-through of increased costs. The district court appropriately rejected the latter contention on the basis of the rationale expressed in the quotations from the *Kansas-Nebraska* Interpretation set out in footnote 12, *supra.* A related con-

tention that the district court failed appropriately "to apprehend" some violation of regulatory purpose that would result from "rigid" adherence to the average price method is without merit.

Texaco claims in the alternative that if the court sustains DOE's interpretation of Subpart K, the regulation should be invalidated on the ground that it failed to take into account, beyond the required objectives of the mandatory price regulations enumerated in the EPAA, other relevant factors which the merits of appellants' incremental costing system are claimed to have invoked.

The preamble to Subpart K as quoted in our summary of the regulatory history itself demonstrates a proper balancing of the objectives the agency was mandated to consider. Nothing appears to the contrary. *Basin, Inc. v. Federal Energy Administration,* 552 F.2d 931, 935 (Em.App.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977); *Amtel, Inc. v. Federal Energy Administration,* 536 F.2d 1378, 1383, n. 9 (Em.App.1976); *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, 1397 (Em.App.1975). *Cf. Mobil Oil Corp. v. Dept. of Energy,* 610 F.2d 796 (Em.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), deemed inapposite to the circumstances of the present case.

But Texaco would bypass the apparent consideration and balancing by the agency of the objectives of the Act, and concentrate upon the assumed reasonableness of its own incremental costing dismissing fixed-quantity contracts as irrelevant.

---

strued to be an interpretation, ruling, or official position of FEA, but rather should be viewed solely as a statement of the manner in which the provisions of 10 CFR 212, Subpart K, are currently applied in our audits of natural gas processors.
White to Texaco, May 17, 1977.

18. [The Oil Company] knew from the regulations themselves that only an official interpretation by the General Counsel's Office could furnish any assurance for its new course; it chose not to request one.
*Pennzoil Co. v. United States Dept. of Energy,* 680 F.2d 156, 179 (Em.App.1982), *cert. dismissed,*

459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983), *supra.*

19. The estoppel issue was properly before the district court on Texaco's motion for new trial and defendants' cross-motion for summary judgment on all issues raised in the plaintiffs' joint amended complaint. Texaco's contention that it never received DOE's motion is unpersuasive in light of its admitted receipt of the briefs on the motion, its attendance at the oral hearing thereon and its failure to complaint about lack of service of the motion until reaching this court.

Upon such a premise, it charges the agency with having failed to consider, or even to be "aware" of, the existence of fixed-quantity contracts in the industry. The regulatory history that we have summarized militates against both the assumption and the conclusion. Texaco's argument is based upon an erroneous view of the regulation in supposing that it differentiated between sales made under existing contracts during the month of measurement depending on whether they were in satisfaction of surplus or fixed-quantity contracts. Its reliance upon two cited cases is misplaced.[20] Neither of them deals with a comparable situation, but both recognize principles which weigh against appellants' contention that Subpart K as construed by the district court is arbitrary or capricious in any respect.

## SUBPART E [21]

 In making clear in Ruling 1975–6, *supra,* "that increased costs of natural gas shrinkage could be passed through as increased product costs pursuant to the provisions of Subpart E....", the agency conceded that it "never [had] made very clear how the price rules of Subpart E, which did not specifically address the activity of natural gas producers and processors, should be construed in their application to such activities." 40 Fed.Reg. 23320 (May 29, 1975). Nor did the agency in that ruling define the method for calculating shrinkage during the Subpart E period as we have already recognized. *Twin City Barge & Towing Corp. v. Schlesinger,* 603 F.2d 197, 200 (Em.App.1979). Accordingly, the district court considered whether alternative methods utilized or contended for by appellants

were reasonable under the circumstances. *See Standard Oil Co. v. Department of Energy,* 596 F.2d 1029 (Em.App.1978). The district court determined that they were not. The parties here are agreed that the issue before us is essentially one of reasonableness.

Exxon contends that its intrafirm "transfer pricing" method, derived through the use of the firm's "historical accounting procedures" by analogizing the raw material costs of crude oil to natural gas, was a reasonable method to calculate the "increased cost of NGLs" prior to January 1, 1975. In the alternative, the appellants contend that they were entitled to recalculate the increased cost of NGLs based on their theory of "incremental increases in value of natural gas shrinkage."

The district court held that to the extent the refiners were assigning prices on intrafirm transfers of natural gas liquids based on factors other than actual increases in the cost of natural gas liquid products, the practice was unreasonable and not in accordance with Subpart E, in the light of Subpart K and Ruling 1975–6; that appellants' incremental costing method for computing shrinkage was unreasonable for the Subpart E period, and that during that period appellants were entitled to compute product costs in the evaluation of shrinkage in accordance with the weighted-average method confirmed by the court.

We affirm the district court's ruling with respect to Subpart E, essentially for the reasons well stated by Judge Woodward, 582 F.Supp. 920–21, 930–34.[22]

**20.** *Bowman Transp. v. Ark.-Best Freight System,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), while recognizing that a court reviewing an administrative determination must consider whether the administrative decision was based on an evaluation of the relevant factors and whether there has been a clear error of judgment, notes that it must limit itself to a very narrow scope of review under the "arbitrary and capricious" standard. *Motor Vehicle Mfr's Ass'n v. State Farm,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), held that the revocation of a safety standard for automobiles requiring safety restraints was arbitrary and capricious because it was not coupled with a consideration

of significant relevant factors, but cautions against any assumption that an agency is required to consider all possible alternatives in reaching its decision.

**21.** 10 C.F.R. §§ 212.81, *et. seq.*

**22.** *Cf. Gulf Oil Corp. v. Department of Energy,* 671 F.2d 485 (Em.App.1982), which held that Subpart K in effect provided that the transfer of NGLs and NGLPs by gas processor-refiners to affiliated marketers constituted "first sales" within the contemplation of that subpart and that the limitations with respect to sales to affili-

## ETHANE EXCLUSION
RULE—ESTOPPEL

The ethane exclusion rule included in Subpart K by application of a V-factor required natural gas processors to allocate substantial shrinkage costs to lower-value ethane which was exempt from price controls and thus proportionally decrease costs assigned to other NGLPs—propane, butane, and natural gasoline—which had a higher thermal content and market value and which were subject to controls.

While the district court summarized the various arguments on the validity or invalidity of the related rulemaking and the rule itself, it decided none of the issues posed thereby in view of its holding that the "transfer" of the rule from its crude oil context in Subpart E to the natural gas liquids context of Subpart K was invalid apparently by reason of some *res judicata* or collateral estoppel effect of *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), *supra*.[23]

This holding cannot be resuscitated, as appellants would have us do, by a rationalization that the district court really meant merely that our prior decision was controlling in principle or upon its reasoning or, as counsel for Exxon puts it, because of "functional equivalency." In the former case there was a complete failure of notice in advance of the promulgation of the regulation and a conceded failure of the agency to consider objectives mandated by the governing statute and the oil company was in defensible litigious posture. Here the equitable position of the appellants is exceedingly infirm and the record supports rather than conclusively negates the validity of the rulemaking with which we are now concerned.

In expansive deference to our prior decision and upon the basis of a simple contention by DOE that transfer of the V-factor to Subpart K was a mere technical amendment which did not require notice and opportunity for comment, the trial court understandingly fell into error.[24]

ate entities in Subpart E had not been carried forward into K. While not asserting that this case was literally inconsistent with the district court's decision here, Exxon's counsel in oral argument suggested that its importance had not been developed sufficiently in the briefs, and contended that the district court's reasoning had thrown into question the validity of its weight-average construction by emphasizing the importance of (1) regulatory language, (2) regulatory purpose and history, (3) contemporary construction and (4) basic fairness. It already must be sufficiently evident from what we have said in the foregoing discussion that we believe the method upheld by the district court amply met these tests in the case now before us.

**23.** Although DOE may be correct in its position that at the time the ethane exclusion was promulgated, it considered that its action was only a "technical transfer" which required no further notice and opportunity for comment, the "transfer" was of the provision which has been conclusively determined to have been null and void, procedurally and substantively. It would be unreasonable to find that the transfer to a new subsection gave the provision new life. The ethane exclusion provision has, in effect, been determined by a final decision of TECA to be invalid, and this court cannot find to the contrary.

DOE's contention that the doctrine of laches prevents any judgment on behalf of the plain-

tiffs on the ethane exclusion is rejected. Laches is not available as a defense where, as here, the regulation in question has been ruled null and void.
582 F.Supp. at 925.

**24.** DOE did not contend in the district court, nor does it maintain here, that no new rulemaking whatsoever was required and thus not carried out. *See, e.g.,* DOE's express denial of the allegations of the appellants' Joint First Amended Complaint that the volumetric apportionment rule did not appear in the proposed Subpart K, that the agency provided no prior notice or opportunity to comment, and that the agency did not consider relevant factors, R. 1256–7, 1269. There was a mechanical transfer of the new proposed rule from its original location in Subpart E to K. The propriety of this latter transfer becomes obvious from our review of the rulemaking leading up to it. But before that transfer there was notice given which DOE contended before the district court "was sufficient to place the industry upon notice that the agency would continue all existing rules under Subpart E, including the V-factor which required volumetric allocation of increased product costs to ethane and other exempt products," and this contention was noted by Judge Woodward at the time he made his decision and was rejected in view of his erroneous holding that our prior decision precluded him from considering it. 582 F.Supp. at 924–25.

The district court's summary rejection of DOE's laches defense on the ground that it was not available in a situation where the regulatory provision already had been ruled null and void by this court suffered from similar infirmity.

The question remains whether, in necessarily reversing, the case should be remanded for its reconsideration of the issues of laches and the substantive and procedural validity of the rule or in the interest of judicial economy decided on this appeal as a matter of law. While we have concluded that DOE's laches defense is dispositive, it can better be evaluated in the light of some additional regulatory history. The general regulatory history reviewed at the outset of this opinion, and the description of the V-factor as it existed in the crude oil context in April 1974, as referred to in and invalidated by *Mobil*, 610 F.2d at 799–80, are sufficient to bring us up to August 9, 1974, in a more particularized review of developments relating to the ethane exclusion rule.

On the last-mentioned date the agency modified the Special Propane Rule to exclude from the price of propane not only the costs attributable to ethane but costs attributable to any other refined product. Emergency Amendment to Special Propane Rule, 39 Fed.Reg. 28608–09 (August 9, 1974). A conforming amendment was made to the V-factor later that month. 39 Fed.Reg. 30828 (Aug. 26, 1974). Shortly thereafter Congress determined in section 5(b)(ii) of the Federal Energy Administration Act of 1974, that it would be "equitable" for the FEA to allow only costs directly related to propane production to be allocated to propane. The agency adhered to this principle in promulgating the Subpart K cost allocation provisions for NGLPs.

On September 10, 1974, the FEA issued a notice of proposed rulemaking with respect to the new Subpart K, as noted in the regulatory history before recited. The proposals included modification of the refiner rules contained in Subpart E to restrict the amount of increased product cost allocable to special products and to authorize the allocation of increased costs to whichever covered products refiners desired. In view of the introduction of the new natural gas shrinkage concept, the agency proposed also a passthrough of such increased cost upon a basis analogous to the passthrough of increased costs of refined crude oil. 39 Fed.Reg. 32720 (Sept. 10, 1974).[25]

Comment was particularly invited as to whether the Special Propane Rule should be extended to cover butane and natural gasoline. 39 Fed.Reg. at 32720. The inclusion of butane and natural gasoline within the Special Propane Rule would have operated to prohibit the allocation of costs associated with ethane to the other three products, because only four basic NGL products were produced at gas plants—propane, butane, natural gasoline and ethane.

In the course of the rulemaking, the agency decided that in order to make Subpart K "as simple and understandable as possible," 39 Fed.Reg. 44407 (Dec. 24, 1974), independent gas processors should be taken completely out of Subpart E, with the simplified rules of Subpart K to control all of their activities, while crude oil refiners would remain subject to the provisions of Subpart E. This necessitated the adoption of some of the provisions of Subpart E for use in Subpart K, including a V-factor as it related to ethane, the only exempt product involved in natural gas processing. Thus, an ethane exclusion rule was included in the new Subpart K at section 212.147, codified in 10 C.F.R. 212.167(a), later renumbered 212.168(a).[26]

**25.** The proposed § 212.144, "Application of increased costs," included the following statement: "Any firm which incurs increased product costs or increased non-product costs with respect to processing or fractionating natural gas liquids in a particular plant may pass such costs through, in accordance with the cost pass-through provisions for increased costs of Subpart E. . . ." 39 Fed.Reg. 32730 (Sept. 10, 1974).

**26.** This modified V-factor as adapted in Subpart K was thus defined:

§ 212.167 Allocation of increased product costs.

In the notice of proposed rulemaking, the agency had stated that the Special Propane Rule was subject to comment and testimony in this proceeding, "and is also a part of the FEA proposal for passing through increased costs of processing natural gas liquids...." 39 Fed.Reg. at 32720. Refiners had been advised of the breadth and interrelationship of the proposals in the published notice of proposals.[27]

The Subpart K preamble reiterated this relationship between the allocation of costs of producing propane and the other natural gas liquid products:

A principal aspect of the regulations adopted today is that they serve to allocate costs of producing propane and other natural gas liquid products to the prices which may be charged for those products, consistent with the provisions concerning propane price regulations of § 5(b)(11) of the Federal Energy Administration Act of 1974 (Pub.L. 93–275).

 This record indicates to us that appellants were reasonably on notice during the Subpart K rulemaking that a V-factor was being considered for ethane.[28] But certainly they had full knowledge of the form as well as substance of the ethane exclusion rule when Subpart K was published on December 24, 1974. Their acquiescence in the operation of that rule and their failure to take any action to question it until July 1981, clearly sustain DOE's defense of laches against appellants' attack upon the rule in view of the uncontroverted record before us. *See Mobil Oil Corp. v. Dept. of Energy*, 728 F.2d 1477, 1487–89 (Em.App.1983); *Independent Bankers Ass'n of America v. Heimann*, 627 F.2d 486 (D.C.Cir.1980). *Cf. Energy Co-Op, Inc. v. U.S. Dept. of Energy*, 659 F.2d 146, 150 (Em.App.1981).

*(a) Exclusion of increased product costs attributable to ethane.* The total amount of increased product costs attributable each month to a given volume of natural gas shall be reduced each month by an amount equal to the product of the increased product costs multiplied by

$$\frac{(Ve^u)}{(V^u)}$$

where:

$V^u$ = The total volume of all natural gas liquid products and ethane derived from that volume of natural gas and sold in the current month, and

$Ve^u$ = The total volume of all ethane derived from that volume of natural gas and sold in the current month.

27. The FEA price regulations are complex and interrelated. Many of the specific proposals made herein affect various other aspects of these regulations. The nature and extent of the revisions being proposed in this notice of rulemaking are quite broad.... Also, depending on the nature of the comments received in this proceeding, certain proposals in this notice may be placed into effect more quickly than others, although the objective is to have all these proposals placed into effect as soon as possible. It may well develop, however, that certain proposals will evoke comments and will require more extensive analysis than others.
39 Fed.Reg. 32725 (Sept. 10, 1974).

28. Administrative regulations are presumed to be valid and entitled to deference in the absence of some showing to the contrary or some inherent unreasonableness. Specific and final formulations of noticed subject matter are not required in advance if the path of the agency is reasonably discernible in the rulemaking, practical considerations and the simplicity of administration are not irrelevant, and recitals by rote of mandated statutory objectives, or alternative or variations, are not the hallmarks of sufficient rulemaking where the substance of full, fair and rational consideration appears. *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477 (Em. App.1983); *McCulloch Gas Processing v. Dept. of Energy*, 650 F.2d 1216 (Em.App.1981); *Texaco, Inc. v. Federal Energy Administration*, 531 F.2d 1071 (Em.App.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). *Cf. Mobil Oil Corp. v. Department of Energy*, 647 F.2d 142, 144, n. 6 (Em.App.1981), and *Mobil Oil v. Dept. of Energy*, 610 F.2d 796, 805 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980), in which we sustained attacks against certain V-factor regulations for other reasons, but indicated no view that there was anything inherently unreasonable in the volumetric allocation of product costs and, indeed, mandated adherence to an intervening congressional direction that in specifying prices or prescribing the manner for determining them, the agency "shall not permit more than a direct proportionate distribution (by volume) to [certain named special products] and propane produced from crude oil, of any increased costs of crude oil incurred by a refiner...." *See* 15 U.S.C. § 753(b)(2)(D), incorporating a provision of the Energy Policy and Conservation Act amending in 1975 the EPAA.

Soon after Subpart K was promulgated, Mobil Oil, initially one of the parties to this consolidated appeal, requested the agency to change the ethane exclusion formula to allocate costs on a Btu rather than a volumetric basis. Mobil then made no claim of any procedural defect nor did Exxon or Texaco assert objection to the ethane exclusion rule at all. Indeed, none of them did so until 1981, following the expiration of DOE's authority to either issue or amend any regulations for the correction of defects to the extent they may have existed.

Even more clearly indicating acceptance of the validity of the ethane exclusion rule, Exxon in the initial attack upon Subpart K, specifically limited its objections to the shrinkage provision and directly related aspects and made no reference either in form or substance to the ethane exclusion rule.[29] In June 1979, Mobil successfully sought to intervene in the present litigation. It made no mention of the ethane exclusion rule either expressly or by implication. Some two years later it did file a motion to amend its complaint to allege that the shrinkage provision was procedurally in-

firm, still not questioning the ethane exclusion rule.

On May 22, 1981, Mobil filed an amended complaint raising for the first time a question concerning the validity of the ethane exclusion rule and almost two months later the present appellants joined with Mobil in a "Joint First Amended Complaint of Refiner Plaintiffs" repeating Mobil's formulation of an attack upon the rule on substantive and procedural grounds.

Appellants respond to the untimeliness of this wholly new claim so suddenly emerging from the sea of different controversy with the contentions that their complaints in their declaratory judgment action were "defensive" in view of DOE's enforcement actions elsewhere thus rendering the doctrine of laches inapplicable, although appellants do not contend that the enforcement actions directly involve the validity of the ethane exclusion rule,[30] and that in any event DOE has demonstrated neither inexcusable delay nor prejudice as foundations for appellants' laches claim. The only ex-

---

**29.** Exxon's complaint filed July 8, 1975, stated:
 This lawsuit contests the authority of the defendants to control the prices of natural gas liquids (NGLs) and challenges the method for determining the base period and current values of natural gas liquids for the purpose of passing their increased costs through to the finished products made from them. [R. 2.]
 It specifically attacked shrinkage as "[t]his new method of valuation substantially [reducing] the value for costs purposes of the NGL's Exxon producers and does not represent their true value." R. 6. Its closing allegations summarize the basis of its complaint in terms of the FEA's having provided this "new method of valuation" without prior notice or public comment, making it retroactive by Ruling 1975–6, the effect of this ruling being to deprive Exxon of substantial costs, causing to Exxon substantial lost revenues caused by both the method of valuation in Subpart K and Ruling 1975–6, and stating the reasons why it claimed the "actions are contrary to law and should be set aside," R. 7, none of which touch upon the ethane exclusion rule. It is ironical that at that time Exxon saw in Subpart K and Ruling 1975–6 this objectionable "new rule on shrinkage," but now perceives in it nothing inconsistent with appellants' own "incremental cost" interpretation of the shrinkage provision.

Texaco first sought to intervene on Feb. 23, 1979, limiting its interest to the shrinkage provision and thus explaining its delay in attacking those provisions: "Until shortly before January 5, 1979, when DOE first challenged Texaco's shrinkage computation for NGL's, Texaco did not have a dispute with DOE over such computation. Accordingly, Texaco has timely sought to intervene here." R. 672.

**30.** DOE has represented that the complaints in the enforcement actions do not charge appellants with failure to apply the ethane exclusion rule and that at the present time it has no evidence that they did not comply with that rule. The appellants' only rejoinder is that they have been charged with the "overpricing of propane, butane and natural gasoline in violation of Subpart K," and that this encompasses the ethane exclusion rule. Again, it is somewhat remarkable that thus seeing in such a general claim the inclusion of the ethane exclusion rule, appellants have argued in another connection that they did not perceive in the rulemaking of Subpart K any advance notice of the inclusion of that rule, especially in view of the additional supporting signals given to them by the agency as already summarized.

cuse they tender for the delay is the untenable assertion that their attacks against Subpart K prior to 1981 were broad enough to challenge the ethane exclusion rule.

The appellants waited until after decontrol to raise their challenge, when it was too late for the agency to attempt to adjust the regulatory system should the challenge have been successful. It is reasonable to infer from the record that most if not all other refiners routinely complied with the rule as promulgated and that possibly billions of dollars were allocated by them to exempt ethane.

In *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477, 1489 (Em.App. 1983), *supra*, Judge Lacey for the court answered and rejected arguments similar to all of those advanced by appellants here against the application of the doctrine of laches. We adopt for the purposes of the present case his reasoning in so doing without repeating it here, 728 F.2d at 1487–89. There we held that the laches defense could not be decided on the record before the court under circumstances peculiar to that case. Here the record of controlling circumstances is clear and indisputable.

We hold that appellants by their laches are barred from questioning the substantive or procedural validity of the ethane exclusion rule *during the period it was in effect as a part of Subpart K.*[31]

## CONCLUSION

We have considered other related contentions and have found them to be without merit or unpersuasive.[32]

The judgment of the district court is affirmed in all respects except concerning the ethane exclusion rule. As to the latter, the judgment is reversed and that rule as incorporated in Subpart K is hereby adjudged to have been valid.

IT IS SO ORDERED.

**31.** *Cf. Independent Bankers Ass'n of America v. Heimann, supra,* where the district court failed to sustain the defense of laches and its judgment was reversed, and the case remanded with directions to dismiss the complaint.

**32.** Appellants following oral argument lodged with the court a motion for leave to file a response, and an attached response, to a claimed misuse by defendants of extra-record material. This material is included as Appendix A in DOE's reply brief and consists of comments filed by Exxon in response to the proposed notice of rulemaking. DOE refers to the comments to support its argument that it was economically rational to allocate costs to ethane on a volumetrically proportionate basis. Appellants contend that DOE has misused the comments because they have nothing to do with volumetrically proportionate allocation to ethane of increased costs of shrinkage, DOE has extracted quotes out of context, and has ignored other statements that are directly contrary to the inference advanced by DOE. In our analysis, neither DOE's use (or misuse) of these comments, nor plaintiffs' response thereto, has had significance in the disposition of this appeal.